## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HEIDI STIRRUP, *et al.*,

        *Plaintiffs*,

        v.

JOSEPH R. BIDEN, JR., *et al.*,

        *Defendants*.

Civil Action No. 21-1893 (TJK)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*/s/ Jeffrey E. McFadden*
Jeffrey E. McFadden (DC. Bar No. 434234)
LAW OFFICES OF JEFFREY E. MCFADDEN, LLC
312 Prospect Bay Drive East
Grasonville, MD 21638
Phone: (410) 490-1163
jmcfadden@jmcfaddenlaw.com

*/s/ Michael T. Rose*
Michael T. Rose (S.C. Bar #4910)
(Admitted *pro hac vice*)
MIKE ROSE LAW FIRM, PC
409 Central Ave.
Summerville, SC 29483
Phone: (843) 871-1821
mike@mikeroselawfirm.com

*/s/ Richard A. Epstein*
Richard A. Epstein (CA Bar #43329)
(Admitted p*ro hac vice*)
16 Thomas Place
Norwalk, CT 06853
Phone: (773) 450-4476
raepstein43@gmail.com

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................................ iii

POINTS AND AUTHORITIES ..................................................................................................... 1

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

The Service Academy Boards of Visitors and Their Statutory Frameworks .................... 2

Appointment of Plaintiffs to a Service Academy BOV .................................................... 7

The Secretary of Defense's Unlawful Suspension of the Boards ..................................... 7

The President's Unlawful Termination of Plaintiffs Stirrup, Lengenfelder, and
Gleason ............................................................................................................................. 9

The Secretary of Defense's Issuance of the Reinstatement Memoranda and
the Unauthorized Creation of BOV Subcommittees ...................................................... 9

LEGAL STANDARDS .......................................................................................................... 10

Rule 12(b)(1) Standard ................................................................................................... 10

Rule 12(b)(6) Standard ................................................................................................... 11

ARGUMENT ......................................................................................................................... 12

I.   PLAINTIFFS STIRRUP, LENGENFELDER, AND GLEASON
     PRESENT COGNIZABLE CLAIMS FOR THEIR REINSTATEMENT
     TO THE AIR FORCE ACADEMY BOARD OF VISITORS, WHICH
     SHOULD BE HEARD BY THIS COURT. ............................................................... 12

A.   Plaintiffs Stirrup, Lengenfelder, and Gleason Have Standing to Contest
     Their Illegal Removal and To Demand Their Reinstatement. ................................ 12

1.   Plaintiffs Stirrup, Lengenfelder, and Gleason May Seek Redress from
     Presidential Officers for Their Terminations. ................................................... 12

2.   The Separation of Powers is No Bar to the Relief Plaintiffs Stirrup,
     Lengenfelder, and Gleason Seek. ...................................................................... 14

B.   The President Had No Authority to Terminate Plaintiffs Stirrup,
     Lengenfelder, and Gleason from Their Positions on the AFA BOV. ...................... 15

1.   The Basic Statutory Scheme is Complete and Coherent as Written,
     Without Need for Implication. .......................................................................... 15

2.   Members of the Advisory Board are Not Officers of the United States. ............ 16

i

3.   The Case Law Does Not Support the President's Power to Terminate Board Members at Will, Which Power Has Never Been Asserted In Practice By Any Previous President...................................................19

C.   Plaintiffs Stirrup, Lengenfelder, and Gleason Have Stated a Claim for Breach of Contract.......................................................................25

D.   The Third Amended Complaint States a Well-Pleaded Claim of Viewpoint Discrimination Under the First Amendment. ........................29

E.   The Disposed Members of the Board Appointed by the President Should Be Restored to Their Positions and Their Terms Extended So That They Can Continue to Serve Terms of Their Original Length. .........................31

II.   THE CLAIMS BY ALL PLAINTIFFS THAT DEFENDANT AUSTIN WRONGFULLY SUSPENDED THE SERVICE ACADEMY BOVs SHOULD BE HEARD BY THIS COURT AND MOVE FORWARD. .....................32

A.   This Court Has Jurisdiction Over Plaintiffs' Challenge to the Suspensions. ...........32

1.   The Wrongful Suspensions Are Capable of Repetition but Evading Review. .......32

2.   The Suspensions Were Final Agency Actions......................................................33

B.   Defendant Austin Had No Statutory Authority to Suspend the BOVs. ...................34

III.   THE CLAIMS BY ALL PLAINTIFF CHALLENGING DEFENDANT AUSTIN'S ILLEGAL "PACKING" OF THE BOVs SHOULD BE HEARD BY THIS COURT AND MOVE FORWARD..........................................37

A.   All Plaintiffs Have Standing to Challenge Defendant Austin's Illegal Effort to Pack the Boards. ...........................................................37

B.   The Board-Packing Claims are Justiciable............................................................39

C.   Defendant Austin Has No Statutory Authority to Increase the Number and Composition of BOV Members Through the Artifice of "Subcommittees." .....39

CONCLUSION  ...................................................................................................43

# TABLE OF AUTHORITIES

Page

**Cases:**

*Abhe & Svoboda, Inc. v. Chao*
    508 F.3d 1052 (D.C. Cir. 2007) ........................................................ 12

*Aetna Life Ins. Co v. Haworth*
    300 U.S. 227 (1937) ...................................................................... 39

*Akinseye v. Dist. of Columbia*
    339 F.3d 970 (D.C. Cir. 2003) .......................................................... 10

*Al–Owhali v. Ashcroft*
    279 F.Supp.2d 13 (D.D.C. 2003) ...................................................... 11

*Am. Nat'l Ins. Co. v. FDIC*
    642 F.3d 1137 (D.C. Cir. 2011) ........................................................ 10

*Ashcroft v. Iqbal (Iqbal)*
    556 U.S. 662 (2009) ...................................................................... 11

*Bell Atl. Corp. v. Twombly (Twombly)*
    550 U.S. 544 (2007) ...................................................................... 11

*Buckley v. Valeo*
    424 U.S. 1 (1976) ............................................................. 1, 16, 17, 18

*Carlucci v. Doe*
    488 U.S. 93 (1988) ........................................................................ 23

*Citizens For Responsibility & Ethics v. Trump*
    438 F. Supp.3d 54 (D.D.C. 2020) ................................................ 13, 14

*Coal. for Underground Expansion v. Mineta*
    333 F.3d 193 (D.C. Cir. 2003) .......................................................... 11

*Connick v. Myers*
    461 U.S. 138 (1983) ...................................................................... 29

*Dartmouth Coll. v. Woodward*
    17 U.S. 518 (1819) ........................................................................ 40

*Elrod v. Burns*
    427 U.S. 347 (1976) .................................................................. 37, 38

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*
    873 F.Supp.2d 363 (D.D.C. 2012) .................................................... 11

*Humphrey's Ex'r v. United States*
    295 U.S. 602 (1935) .................................................................. 22, 23

*In re Hennen*
  38 U.S. 230 (1839) ................................................................. 20

*Kalaris v. Donavan*
  697 F.2d 376 (D.C. Cir. 1983) ........................................... 23

*Keim v. United States*
  177 U.S. 290 (1900) ............................................................. 23

*Khadr v. United States*
  529 F.3d 1112 (D.C. Cir. 2008) ......................................... 10

*Kokkonen v. Guardian Life Ins. Co. of Am.*
  511 U.S. 375 (1994) ............................................................. 10

*Macharia v. United States*
  238 F.Supp.2d 13 (D.D.C. 2002) ....................................... 11

*Macharia v. United States*
  334 F.3d 61 (D.C. Cir. 2003) ............................................. 11

*Marbury v. Madison*
  5 U.S. 137 (1803) ................................................... 14, 20, 21

*Myers v. United States*
  272 U.S. 52 (1926) .......................................................... 18, 22

*NLRB v. Noel Canning*
  573 U.S. 513 (2014) ............................................................. 20

*Parsons v. United States*
  167 U.S. 324 (1897) ............................................................. 19

*Roe v. Wade*
  410 U.S. 113 (1973) ............................................................. 33

*Settles v. U.S. Parole Comm'n*
  429 F.3d 1098 (D.C. Cir. 2005) ......................................... 10

*Severino v. Biden (Severino)*
  2022 WL 168321 (D.D.C. Jan. 19, 2022) ................ 13, 19, 22

*Spicer v. Biden (Spicer)*
  2021 WL 5769458 (D.D.C. Dec. 4, 2021) .................... *passim*

*Swan v. Clinton*
  100 F.3d 973 (D.C. Cir. 1996) ..................................... 12, 13

*Thomas v. Principi*
  394 F.3d 970 (D.C. Cir. 2005) ........................................... 10

*Trump v. Hawaii*
  138 S. Ct. 2392 (2018) ........................................................ 14

*Trump v. Thompson*
  142 S. Ct. 680 (2022) .......................................................... 14

*United States v. Alabama G.S. R Co.*
   142 U.S. 615 (1892) ............................................................................ 24

*Uzuegbunam v. Preczewski*
   141 S.Ct. 792 (2021) ....................................................................... 12, 13

*Youngstown Sheet & Tube Co. v. Sawyer*
   343 U.S. 579 (1952) ............................................................................ 14

**Statutes:**

5 U.S.C. § 10 ............................................................................................. 5

10 U.S.C. § 7455 ............................................................................. *passim*

10 U.S.C. § 8468 ............................................................................. *passim*

10 U.S.C. § 9455 ............................................................................. *passim*

33 U.S.C. § 901 ...................................................................................... 23

42 U.S.C. § 1975 .................................................................................... 27

50 U.S.C. § 402 ...................................................................................... 23

**Constitutions:**

U.S. Const., 1st Amend. .................................................................... 37, 38

U.S. Const., 4th Amend. ......................................................................... 37

U.S. Const., 5th Amend. ......................................................................... 26

U.S. Const., art. I, § 10 ........................................................................... 40

U.S. Const., art. II, § 2 ....................................................................... 1, 16

U.S. Const., art. III, § 2 .......................................................................... 21

**Court Rules:**

Fed. R. Civ. P., rule 12 ..................................................................... 10, 11

**Other:**

5B Charles Alan Wright & Arthur Miller, Federal Practice and Procedure:
   Civil § 1350 (3d ed. 2004) ................................................................. 11

41 C.F.R. § 102–3.30 ............................................................................. 29

41 C.F.R. § 102–3.50 ..................................................................... 2, 3, 35

41 C.F.R. § 102–3.105 ........................................................................ 4, 29

41 C.F.R. § 102–3.120 ............................................................................. 5

41 C.F.R. § 102-3.175 ............................................................................. 6

41 C.F.R. § 103–3 .................................................................................... 4

41 C.F.R. § 103–3.30 ................................................................................................ 4

41 C.F.R. § 103–3.185 .............................................................................................. 4

Chelsey Cox, "Biden administration begins removing Trump appointees from military academy boards," USA Today (Sept. 8, 2021) ......................................... 30

Chris Cameron, "White House Forces Out Trump Appointees From Boards of Military Academies," NY Times (Sept. 8, 2021) .................................................. 30

Christopher T. Wonnell, *The Contractual Disempowerment of Employees*, 46 STAN. L. REV. 87, 115 (1993) ............................................................................ 26

Evan Perez & Christian Carrega, "DOJ asks Trump-appointed US attorneys to resign," CNN Politics (Feb. 9, 2021) ...................................................................... 26

Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1 (2021) ........................... 21

Jed Handelsman Shugerman, *Presidential Removal: The Marbury Problem and the Madison Solutions,* 89 Fordham. L. Rev. 2085 (2021) ........................................ 21

Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 Stan. L. Rev. 443 (2018) ................................................................................................................ 18

John Manning, *Separation of Powers as Ordinary Interpretation*, 124 Harv. L. Rev. 1939 (2011) ......................................................................................................... 22

Peggy McGlone, "Biden removes Trump appointees from boards that shape the District," Washington Post (Feb. 10, 2021) ......................................................... 28

Professor Adrian Vermeule, *Conventions of Agency Independence*, 113 Colum. L. Rev. 1163 (2013) ............................................................................................... 27

Restatement (Third) of Employment Law § 908 (2015) ......................................... 26

Wallace Ludel, "President Joe Biden removes Trump appointees from US Commission of Fine Arts," The Art Newspaper (May 25, 2021) ......................... 28

**Points and Authorities**

---

## INTRODUCTION

This case challenges a political purge orchestrated and executed by the highest levels of the federal government. This past year, in a set of strategic moves, the President of the United States unilaterally purported to fire all the presidential appointees of the Boards of Visitors ("BOVs" or "Boards") of this Country's military service academies who had been appointed by his predecessor in office to rotating three-year terms. Prior to his unprecedented actions, these Boards had for decades been known for their excellence, their bipartisanship, their independence, and their diversity of views. Joseph Biden, Jr. is the first and only president ever to remove people from advisory boards—not just service academy advisory boards, but advisory boards that function in many other contexts. His stated reason—to make sure that these positions are staffed only by people who share his values—necessarily compromises the independence of these and other advisory boards by undermining the system of checks and balances that for years governed their operation.

The President's undefended assumption was that these Board members were simply officers within the executive branch. But that assumption is flatly false. All officers in the executive branch must be appointed exclusively under the Appointments Clause, Art. II, § 2, cl. 2 of the U.S. Constitution, all of which must be initiated within the Executive Branch. *See Buckley v. Valeo*, 424 U.S. 1, 124–128 (1976). The BOV members also include appointees by the President Pro Tempore of the Senate and the Speaker of the House, which would render these Boards unconstitutional if they exercised executive power. But since they do not, they are immune from presidential removal.

Not only does the President lack the power to remove Board members, but he lacks the power to suspend their operations, either directly or through all officers within the executive branch, including the Secretary of Defense and his subordinates. The Secretary of Defense has

justified the shut-down of these BOVs on the ground that his Department needs to conduct a "zero-based" review of their operations. But even if that were true, that operation need not and should not disrupt the operation of an independent Board or lead to the creation of so-called subcommittees that contain no Board members and report only to the Secretaries of the Air Force, Army, and Navy.

This entire episode represents an unprecedented grab of political power that is not supported by the Constitution, by statute, by regulation, or by historical practice. Defendants' Motion to Dismiss wrongly treats members of these advisory boards as officers within the Executive Branch. There are no procedural reasons why this case cannot be adjudicated on the merits. Accordingly, the case should be allowed to go forward given that Plaintiffs have stated well-pleaded causes of action in each and every count of their Fourth Amended Complaint, for which Plaintiffs are seeking leave to file concurrently with this opposition.

## STATEMENT OF FACTS

### *The Service Academy Boards of Visitors and Their Statutory Frameworks*

The BOVs are oversight boards created by congressional statutory mandates to investigate, oversee, and make recommendations about the United States Air Force Academy ("Air Force Academy" or "USAFA"), the United States Military Academy ("West Point" or "USMA") and the United States Naval Academy ("Naval Academy" or "USNA") (individually also "Academy" and collectively "Service Academies"), to the Defendants, to the United States House Armed Services Committee and the United States Senate Armed Services Committee, and/or the President of the United States. *See* 10 U.S.C. § 9455 (Air Force Academy BOV); § 7455 (West Point BOV); § 8468 (Naval Academy BOV). The oversight and investigative authority of the BOVs thus flows from the powers of Congress as set forth in Article I of the Constitution. On their face, the statutes make clear that Congress itself established the BOVs; they are thus "non-discretionary." *See* 41 C.F.R. § 102–3.50(a). Nothing in the statutes express or

suggest that Congress directed the President or the Department of Defense, acting independently, to establish the Boards. To the contrary, pursuant to the first clause of 41 C.F.R. § 102–3.50(a), Congress itself established the BOVs.

The Boards do not wield any executive power. They also do not exercise "quasi-legislative" or "quasi-judicial" powers. Under their respective Charters,[1] these BOVs "shall provide independent advice and recommendations." Charter, USAFA BOV, Sect. 3; Charter, USMA BOV, Sect. 3; Charter, USNA BOV, Sect. 3; *see id*., Sects. 2 (describing each Board as a "non-discretionary advisory committee"). Each Board "member, based upon his or her individual experiences, exercises his or her own best judgment concerning matters before the Committee, does not represent any particular point of view, and discusses and deliberates in a manner that is free from conflicts of interest." *Id.*, Sects. 12.

The functions of the BOVs render them, fundamentally, as distinctive institutions, validated by long experience, that combine the efforts of the executive and the legislative branches to provide much needed independent advice to the President, the Congress, and the public at large. To preserve its independence from the President, Members of Congress, not members of the Executive Branch, serve as authorized members of the Service Academies' Boards of Visitors. Consistent with the fundamental, constitutional precept of civilian control of the military, Congress recognized that the Executive Branch could not and should not try to provide, on its own, adequate and unbiased oversight of the Nation's military Service Academies. It therefore created the Boards of Visitors to provide independent and necessary oversight of those Academies.

Each of the three BOVs has 15 members. Six of those members are appointed by the President. The other members consist of the Chairman of the Senate Armed Services Committee or his/her designee, the Chairman of the House Armed Services Committee or his/her designee,

---

[1]    The Boards' Charters are attached as Exhibit A (USAFA BOV), Exhibit B (USMA BOV), and Exhibit C (USNA BOV) to the Declaration of Jeffrey E. McFadden, as are all other Exhibits cited in this brief.

four other Members of the House designated by the Speaker of the House, and three other Members of the Senate designated by the Vice President or the President Pro Tempore of the Senate. 10 U.S.C. § 9455(a)(1–5); § 7455(a)(1–5); § 8468(a)(1–5).

The administration and management of the BOVs is governed by the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App., and its implementing regulations, 41 C.F.R. §§ 103–3 to 103–3.185. Pursuant to 41 C.F.R. § 102–3.105(b), the Department of Defense has issued its own instruction for the administration and management of the federal advisory committees falling within DoD. *See* Department of Defense Instruction ("DoDI") 5104.04 (August 6, 2007).[2]

FACA's implementing regulations require that the BOVs, like all advisory committees within FACA's purview, have "[b]alanced membership;" specifically, each of the BOV's "must be fairly balanced in its membership in terms of the points of view represented and the functions to be performed." 41 C.F.R. §§ 103–3.30(c). The Secretary of Defense, as agency head of the DoD, must "[d]evelop procedures to assure that the advice or recommendations of advisory committees will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." *Id.*, § 102–3.105(g). And DoDI 5105.04, Paragraph 4.6 sets forth, as DoD policy, "Committee membership, as a whole, shall be balanced in terms of points of view and the functions to be performed."

None of the three governing statutes provides for the creation of BOV subcommittees; nor do they authorize the Secretary of Defense or the Deputy Secretary of Defense to staff such subcommittees with appointees selected at their sole discretion, let alone with individuals who are not members of the BOVs. No such subcommittee has ever been authorized or staffed at the directive of any previous Secretary of Defense, because the Department of Defense had previously determined that any such subcommittees had no lawful authority, a decision Defendant Austin acknowledged in three memoranda issued on or about September 17, 2021.[3]

---

[2]    For the Court's convenience, a copy of DoDI 5105.04 is attached as Exhibit D.

[3]    The three memoranda are attached as Exhibit E.

Indeed, DoDI 5105.04, Paragraph 5.6.2, expressly states that the DFO *shall* "[e]nsure that no DoD-Supported Committee establishes Subcommittees unless specifically authorized by statute, executive order, or the Committee's Charter."

Each Presidential appointee has a three-year term, but any such appointee may remain as a BOV member after the expiration of his or her term until the President designates a replacement. 10 U.S.C. § 9455(b); § 7455(b); § 8468(b). The terms are staggered so that each year, the President may appoint two persons to succeed the two members whose terms expire. *Id.*

The members of each of the three Boards select the Chairman. Charters, Sects. 12. The Chairman has responsibilities over the Board's operations and meetings, including to certify all meeting minutes. 5 U.S.C. Appendix, Federal Advisory Committee Act, § 10(c). Each Board has a Designated Federal Officer (DFO), who is designated by the Department of Defense in accordance with DoDI 5105.04, Paragraph 5.3.6. *See also* Charters, Sects. 8. The responsibilities and functions of the DFO's are governed by 41 C.F.R. § 102–3.120 and DoDI 5105.04, Paragraph 5.6. Nothing in either the C.F.R. or the DoDI authorizes a DFO, let alone the Secretary of Defense, to suspend the operation of a BOV. Pursuant to the AFA BOV's Bylaws,[4] the Superintendent of the Air Force Academy selects an Executive Secretary, who serves as a designated Alternate DFO. *See* Bylaws, Sect. 1.04.

There are three differences among the three governing statutes pertinent to the issues before the Court:[5]

First, the statutes governing the USMA and USNA BOVs contain no provision for the termination of a member. The statute governing the USAFA BOV permits the Board Chairman, not the President, to terminate a Presidential appointee, but only if the appointee fails, without good cause, to attend two successive Board meetings. 10 U.S.C. § 9455(c)(2)(A) and

---

[4]   The USAFA BOV's Bylaws are attached as Exhibit F.

[5]   The statutes differ from one another in other respects not relevant here.

(c)(2)(B)(i).[6] None of the three statutes governing a BOV provides for termination of a Presidential appointee by a sitting or successor President, and Plaintiffs are aware of no prior instance in which a President has ever terminated a BOV member appointed by that President or a predecessor President.

Second, although all three statutes require their respective BOVs to visit their service academies annually; 10 U.S.C. § 9455(d), § 7455(d), § 8468(d); the statute governing the USAFA BOV requires the Board to make a semi-annual report concurrently to the Secretary of Defense, through the Secretary of the Air Force, and to the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives; 10 U.S.C. § 9455(f); while the statutes governing the West Point and Naval Academy require their respective Boards to make an annual report to the President, 10 U.S.C. § 7455(f); 10 U.S.C. § 8468(f). Irrespective of these differences, all such reports by each of the BOVs are, pursuant to the mandates of FACA's implementing regulations and DoDI 5015.04,[7] available to the public on-line through the Federal Advisory Committee Act data base.[8] The Reports are all readily accessible to Congress and members of the public at large to aid in their review of activities at the three Service Academies.

Third, the statutes governing the USMA and USNA BOVs provide that, "[t]he President shall designate two persons each year to succeed the members whose terms expire that year." 10

---

[6]   A congressional appointee who fails to attend two successive meetings without good cause, as determined by the Chairman, can only be terminated by the congressional appointing authority. 10 U.S.C. § 9455(c)(2)(A) and (c)(2)(B)(ii).

[7]   *See, e.g.,* 41 C.F.R. § 102-3.175(d) (directing that all advisory committee reports be filed with the Library of Congress for public inspection; *see also* DoDI 5105.04, Enclosure 3, Paragraph E3.13.2.1 directing DFO's to comply with the Library of Congress requirement. The DoDI also requires all unclassified BOV reports to be uploaded to the FACA Database. *Id.* Enclosure 3, Paragraph E3.15.2.1.

[8]   *See, e.g.,* https://www.facadatabase.gov/FACA/apex/ FACAPublicCommittee?id=a10t0000001gzjnAAA (Naval Academy).

U.S.C. § 7455(b)(1); 10 U.S.C. § 8468(b)(1). The same provision in the statute governing the USAFA BOV omits the number "two" and simply says "shall designate persons . . ." 10 U.S.C. § 9455(b)(1).

### *Appointment of Plaintiffs to a Service Academy BOV*

President Trump appointed Plaintiff Heidi Stirrup to the USAFA BOV on December 17, 2020. Her term was set to expire on December 30, 2021.

President Trump appointed Plaintiff Douglas Lengenfelder to the USAFA BOV on June 28, 2020. His term was set to expire on December 31, 2021.

President Trump appointed Plaintiff Robert Gleason, Jr., to the USAFA BOV on July 27, 2018, and reappointed him on December 17, 2020. His term is set to expire on December 31, 2023.

The Speaker of the House of Representatives appointed Plaintiff Mark Green, M.D., to the USMA BOV on March 15, 2021. His term is set to expire on December 30, 2022.

President Trump appointed Plaintiff Sean Spicer to the USNA BOV in 2019. His term was set to expire on December 30, 2021.[9]

### *The Secretary of Defense's Unlawful Suspension of the Boards*

On February 4, 2021, Plaintiffs Stirrup, Lengenfelder, and Gleason, as well as other Presidential (but not congressional) appointees to the AFA BOV, received an email from Anthony McDonald, a GS-15 the USAFA BOV's DFO.[10] The email states, in pertinent part, as follows:

---

[9]   Plaintiff Spicer is a party to the instant lawsuit for the limited purpose of challenging the unlawful suspension of the BOVs in February 2021.

[10]   A copy of the e-mail is attached as Exhibit G.

I am reaching out today to inform you that the Secretary of Defense has suspended the operations of all DoD Advisory Committees pending completion of a Zero-Based Review with our review being due to OSD no later than 30 April 2021. You will likely hear about advisory committees being disestablished and board members released from service but given our committee is non-discretionary (required by law) it will remain in place and your board membership will not be impacted.

What does the suspension mean for our board? It means the board will not hold any meetings (formal, preparatory, etc.) or otherwise undertake official board business that would drive expenditure of public funds until the Secretary of Defense has reviewed our business case analysis and lifted suspension of our advisory committee. As such, our previously scheduled 8 April 2021 meeting will be rescheduled to a later date to be determined.

In the meantime, Headquarters Air Force and USAFA staff still have administrative requirements that must be completed in accordance with the Federal Advisory Committee Act and DoD policy such as record-keeping, publishing of minutes, reports, etc. as well as administrative functions related to fully onboarding the new members (background/clearance, ethics, disclosures, etc.), I'd ask for your full and timely cooperation in those matters. Finally, you will continue to receive periodic updates on matters germane to the board.

Accompanying this email were two Memoranda, dated January 30, 2021 and February 2, 2021, respectively, from the Office of Defendant Secretary of Defense suspending the Boards of Visitors of the United States Air Force Academy, the United States Military Academy, and the United States Naval Academy.[11]

---

[11]    Copies of these memoranda are attached as Exhibit H.

***The President's Unlawful Termination of Plaintiffs Stirrup, Lengenfelder, and Gleason***

On September 8, 2021, Plaintiffs Stirrup, Lengenfelder, and Gleason received materially identical e-mails from Katherine Petrelius, Special Assistant to the President, Office of Presidential Personnel, which stated:

> I am writing to request your resignation from the Board of Visitors to the United States Air Force Academy. If we do not receive your resignation by the end of the day today, you will be terminated. Attached is a formal letter.

The e-mails each included an attached letter from Defendant Catherine M. Russell, director of the White House Presidential Personnel Office. The letters stated,

> On behalf of President Biden, I am writing to request your resignation as a Member of the Board of Visitors to the U.S. Air Force Academy. Please submit your resignation to me by the close of business today. Should we not receive your resignation, your position with the Board will be terminated effective 6:00 p.m. tonight. Thank you.[12]

Plaintiffs Stirrup, Lengenfelder, and Gleason made clear in writing to Defendant Russell that they would not resign as a member of the USAFA BOV and that there was no authority requiring them to do so or allowing them to be terminated. The President purports to have terminated their memberships on the USAFA BOV.

***The Secretary of Defense's Issuance of the Reinstatement Memoranda and the Unauthorized Creation of BOV Subcommittees***

On or about September 17, 2021, 19 days after the instant lawsuit was served on Defendants, the U.S. Department of Defense and Secretary of Defense Austin sent memoranda to the

---

[12]   One such e-mail and one such letter are attached as Exhibit I.

Secretaries of the Air Force, Army, and Navy purporting to reinstate the Service Academy BOVs.[13] Despite the absence of any statutory authority, the memoranda purport to authorize the service secretaries to create BOV "subcommittees" staffed by appointees, including non-members of the BOVs, selected at the sole Discretion of the Secretary of Defense or the Deputy Secretary of Defense. This authorization was flatly illegal. *See infra*, Part III.C.

## LEGAL STANDARDS

### *Rule 12(b)(1) Standard*

Pursuant to Federal Rules of Civil Procedure, rule 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject matter jurisdiction. No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is both a statutory and an Article III requirement. *See Akinseye v. Dist. of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003). The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts are courts of limited jurisdiction and that "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction") (internal citations omitted).

When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court should "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). A court may consider materials outside the pleadings to determine its jurisdiction. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098,

---

[13]   Copies of these memoranda are attached as Exhibit E.

1107 (D.C. Cir. 2005); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003). A court has "broad discretion to consider relevant and competent evidence" to resolve factual issues raised by a Rule 12(b)(1) motion. *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F.Supp.2d 363, 368 (D.D.C. 2012) (quoting 5B Charles Alan Wright & Arthur Miller, Federal Practice and Procedure: Civil § 1350, 159–198 (3d ed. 2004)); *see also Macharia v. United States*, 238 F.Supp.2d 13, 20–21 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (2003) (explaining that when reviewing a factual challenge to the truthfulness of the allegations in a complaint, a court may examine testimony and affidavits). In these circumstances, consideration of documents outside the pleadings does not convert the motion to dismiss into one for summary judgment. *Al–Owhali v. Ashcroft*, 279 F.Supp.2d 13, 21 (D.D.C. 2003).

### *Rule 12(b)(6) Standard*

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face. A complaint must be sufficient "to give a defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) *(Twombly)* (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* A court must treat the complaint's factual allegations as true, "even if doubtful in fact," *id.*, but a court need not accept as true legal conclusions set forth in a complaint, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) *(Iqbal)*. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, at 570. A complaint must allege sufficient facts that would allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, at 678–79. In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the

complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (citations omitted).

## ARGUMENT

I. **PLAINTIFFS STIRRUP, LENGENFELDER, AND GLEASON PRESENT COGNIZABLE CLAIMS FOR THEIR REINSTATEMENT TO THE AIR FORCE ACADEMY BOARD OF VISITORS, WHICH SHOULD BE HEARD BY THIS COURT.**

A. **Plaintiffs Stirrup, Lengenfelder, and Gleason Have Standing to Contest Their Illegal Removal and To Demand Their Reinstatement.**

The initial argument of the Defendants is that the Plaintiffs Stirrup, Lengenfelder, and Gleason do not have standing to bring any cause of action related to their termination from the AFA BOV because they cannot seek redress from either the President or the head of his political appointments office.

1. **Plaintiffs Stirrup, Lengenfelder, and Gleason May Seek Redress from Presidential Officers for Their Terminations.**

The Supreme Court has held that, as an "'irreducible constitutional minimum' of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 797 (2021). Defendants implicitly concede that Plaintiffs Stirrup, Lengenfelder, and Gleason have suffered injury that is directly traceable to the Defendants' actions, so that the only issue left on the table is whether the Court is in a position to provide some judicial relief to these Plaintiffs. Courts are traditionally reluctant to dismiss a case on grounds that a grievance is not redressable, because it raises the prospect that an admitted grievance will be allowed to go without any remedy. That concern prompted this court in *Swan v.*

*Clinton*, 100 F.3d 973, 976–981 (D.C. Cir. 1996) to hold that it is possible to allow the requested relief to be applied against other Defendants that do not occupy the President's distinctive role. That accommodation ensures that the President is not personally bound, while at the same time affording the plaintiff needed relief against another responsible government agent.

That middle position was adopted in by two courts in this District in *Spicer v. Biden*, 2021 WL 5769458 (D.D.C. Dec. 4, 2021) and *Severino v. Biden*, 2022 WL 168321 (D.D.C. Jan. 19, 2022). In the former, the court wrote unambiguously that the Plaintiffs could obtain relief against other named Defendants: "the Court reads *Swan v. Clinton*, 100 F.3d 973, to allow relief against those officials." *Spicer v. Biden*, at *3.[14] The same basic approach was taken in *Severino*: "Without holding that it could order the President to formally reinstate the plaintiff, the [*Swan*] court concluded that it could redress the plaintiff's allegedly unlawful removal by ordering the agency's subordinate officials to 'treat[] [him] as a member of the NCUA Board and allow[] him to exercise the privileges of that office.'" *Severino v. Biden*, at *4.[15] This basic outcome, moreover, is assured by the Supreme Court's recent decision in *Uzuegbunam v. Preczewski* with this explicit holding: "A request for nominal damages satisfies the redressability element necessary for Article III standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam v. Preczewski*, 141 S.Ct. at 802. That ruling is critical because its animating principle is that the redressability requirement never becomes a shield that insulates high government officials from their legal misdeeds.

The Defendants try to finesse the clear holdings of these cases by relying on *Citizens For Responsibility & Ethics v. Trump*, 438 F. Supp.3d 54 (D.D.C. 2020), a case far removed from the current dispute. There, the plaintiff's claim was that the "the President and his staffers failed to

---

[14]    We note here that while the court in *Spicer* reached the correct result as to this redressability issue, it was decidedly incorrect in its conclusion that the President had the authority to remove the Plaintiffs from the Naval Academy Board of Visitors. We set forth the reasons why in Part I.B., *infra*.

[15]    It is precisely for this reason (and others) that Plaintiffs are concurrently filing a motion for leave to file a Fourth Amended Complaint that adds the three Service Academy DFOs as defendants.

create, maintain, and properly dispose of records of interactions with foreign leaders." *Id.* at 56. The court rightly dismissed the case on grounds wholly inapplicable here—namely, that under settled precedent the Court "lacks authority to oversee the President's day-to-day compliance with the statutory provisions involved in this case…" Unlike the conduct at question in *Citizens For Responsibility and Ethics*, distinct appointments to an independent board like the Service Academy BOVs are not matters of internal housekeeping and governance; rather, they raise vital issues that go to the proper structure and the organization of government.

### 2. The Separation of Powers is No Bar to the Relief Plaintiffs Stirrup, Lengenfelder, and Gleason Seek.

The Defendants claim that their standing argument is part and parcel of a larger constitutional concern with separation of powers. But their view is wholly untenable to the extent that a President's actions are always immune from judicial review. That claim is true with respect to the internal organization of his office, but it is decidedly false when on the distinct question of whether the President has exceeded the boundaries of his office in dealing with other individuals. The point here has long been established. From *Marbury v. Madison*, 5 U.S. 137 (1803) and *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) to *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) and *Trump v. Thompson*, 142 S. Ct. 680 (2022), courts have imposed constant scrutiny on what the President, in the exercise of his official duties, may or may not do. It has not mattered whether the issue is delivery of a commission to serve as a judge, the President's power to take over private property in his role of commander-in-chief of the armed forces, his ability to establish protocols for vetting foreign nationals traveling to the United States, or his ability to claim executive privilege with respect to his records while in public office. The doctrine of separation of powers protects the President when he operates within his domain of power, but that doctrine cannot be understood in isolation from the parallel doctrine of checks and balances, which prevents his actions from encroaching in areas to which his powers do not extend. In the

instant case, the President has no more power to remove a member of an independent board of visitors than to remove a judge who has been validly appointed—the very issue that was decided in *Marbury*.

### B.   The President Had No Authority to Terminate Plaintiffs Stirrup, Lengenfelder, and Gleason from Their Positions on the AFA BOV.

#### 1.   The Basic Statutory Scheme is Complete and Coherent as Written, Without Need for Implication.

A central issue in this case is whether the President of the United States has any power to deviate from his enumerated powers over the composition and operation of the three BOVs, whatever may be his prerogatives under distinctive statutory schemes relating to the creation of oversight commissions. The statutes (10 U.S.C. §§ 7455, 8468, and 9455) outline both the appointment procedures and the duties for the BOVs, so that there is no need to derive the basic structure by some process of implication.

Under these Sections, the chairman of the Committee on Armed Services of the Senate and the House are members of the BOV by statutory designation. *See, e.g.*, 10 U.S.C. § 9455(a)(2); § 9455(a)(4). In addition, the Vice President, in her capacity of President Pro Tempore of the Senate, and the Speaker of the House make additional appointments, so that the full complement of Committee members is 15—six appointed in staggered terms by the President, five from the House, and four from the Senate. *See, e.g.*, *id.* at § 9455(a)(3); § 9455(a)(5). These advisory boards are reconstituted annually, to reflect the uncertain tenure of the congressional appointees. In contrast, the six presidential nominees serve explicit three-year terms, in accordance with the statutory principle of rotation that lets the sitting President appoint annually two new board members to replace the two members that leave. *See, e.g.*, *id.* at § 9455(b)(1). By design, the presidential appointees to the Boards may serve during the successor President's term in office.

The statutes do not provide for the removal of any appointees without cause. But the statute governing the Air Force Academy BOV does contain an explicit for-cause removal provision which empowers the Board Chairman to terminate any presidential appointee who "fails to attend two successive Board meetings." 10 U.S.C. § 9455(c)(2)(A); § 9455(c)(2)(B)(i). Pursuant to Section 12 of each BOV's Charter, the Board Chairman is selected by the members of the Board. Neither the President nor anyone in DoD has the statutory power to unilaterally remove any of the fifteen Board members.

## 2.    Members of the Advisory Board are Not Officers of the United States.

The central proposition that drives this case is that the multiple methods of appointment under 10 U.S.C. §§ 7455, 8468, and 9455 would be flatly unconstitutional if these members were officers of the United States whose appointments are explicitly governed by Art. II, Section 2, cl. 2:

> [The President] . . . shall nominate, and by and with the advice and consent of the Senate, shall appoint ambassadors, other public ministers and consuls, judges of the supreme court, and all other Officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law: but the Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

*Buckley v. Valeo*, 424 U.S. at 118—nowhere cited nor discussed in *Spicer* or *Severino*—holds that these appointment methods are *exclusive*, such that the appointment of all *officers* of the United States had to be made within this constitutional framework. To be sure, some "inferior officers" may not require Senate confirmation, but as stipulated in the constitutional provision above, their appointments could be vested in either the President himself, the Courts of Law, of the Heads of Department. If the members of the BOVs were thought to be officers of the United

16

States, *Buckley* would void all the appointments made by the President Pro Tempore of the Senate and the Speaker of the House. *Buckley* held that the Federal Election Commission could not consist of six voting members, two of whom were appointed by the President Pro Tempore of the Senate, two by the Speaker of the House, and two by President—all of whom were subject to confirmation by both Houses of Congress. The Commission itself was charged as the administering agency with not only recordkeeping, disclosure, and investigatory functions but extensive rulemaking, adjudicatory, and enforcement powers. *Id.* at 109–10.

The only difference in appointment procedures between the Federal Election Commission and these BOVs is that none of the BOV members were subject to any form of confirmation by either the House, the Senate, or both. Therefore, *if* these Board members were said to be officers of the United States, the entire Committee structure (as well as that for other similar advisory boards elsewhere in the government) would necessarily fail constitutionally, because the ten "officers" from the House and Senate were not appointed in accordance with the Appointments Clause. The Court in *Buckley* noted that under the doctrine of separation of powers, all appointments had to be made by the executive branch. Thus, it wrote Per Curiam:

> Appellants' argument is that this provision is the exclusive method by which those charged with executing the laws of the United States may be chosen. Congress, they assert, cannot have it both ways. If the Legislature wishes the Commission to exercise all of the conferred powers, then its members are in fact "Officers of the United States" and must be appointed under the Appointments Clause. But if Congress insists upon retaining the power to appoint, then the members of the Commission may not discharge those many functions of the Commission which can be performed only by "Officers of the United States," as that term must be construed within the doctrine of separation of powers.

*Buckley v. Valeo*, 424 U.S. at 118–19.

It then clinched the point when it wrote:

> We think that the term "Officers of the United States" as used in Art. II, defined to include "all persons who can be said to hold an office under the government" in *United States* v. *Germaine,* [99 U.S 508 (1879)] *supra,* is a term intended to have substantive meaning. We think its fair import is that any appointee exercising significant authority pursuant to the laws of the United States is an "Officer of the United States," and must, therefore, be appointed in the manner prescribed by § 2, cl. 2 of that Article.

*Buckley v. Valeo*, 424 U.S. at 125–26.

There is no doubt that the exact parameters as to who counts as an officer under the Appointments Clause are subject to much disagreement, especially at the edges. *See, e.g*., for the various permutations, Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 Stan. L. Rev. 443, 458–64 (2018). Thus, great care is required to move from one statutory scheme to another. But a close look at the functions of these advisory committees shows that they exercise none of the "significant authority" needed to be an officer of the United States.

As the term "advisory" suggests, these three BOV committees have no power to order the President or the Congress to do or abstain from performing any given action; nor can they perform any official act themselves. However, by design, they may voice opinions through the use if their "soft" power to help inform the President and the Congress of the need for certain institutional reforms. The President and Congress can ignore their investigations and public reports if they are prepared to take some political risk. It is therefore flatly incorrect for the court in *Spicer* to say that these Board members "are plainly executive officials." *Spicer*, 2021 WL 5769458, at \*15. In fact, they are not executive officers at all, let alone, as the *Spicer* Court asserted, "officials" who are "subject to the President's power of appointment and removal of executive officers" under *Myers v. United States*, 272 U.S. 52 (1926). *Id*.[16]

---

[16]   Note that the term "official" is never used in the Constitution. The document contains 12 references to "officer," which is critical in connection with operation of the Appointments Clause.

### 3.   The Case Law Does Not Support the President's Power to Terminate Board Members at Will, Which Power Has Never Been Asserted In Practice By Any Previous President.

The Defendants, as did *Spicer*, 2021 WL 5769458, at \*3–4 and *Severino*, 2022 WL 168321, at \*6–7, rely on *Parsons v. United States*, 167 U.S. 324 (1897), to support the proposition that the President may dismiss BOV members at will. In *Parsons,* the plaintiff sued the United States for the balance of his salary and fees upon his dismissal. The Court stated that the question presented "is whether the President of the United States has power to remove a district attorney, who had been duly appointed, when such removal occurs within the period of four years from the date of his appointment, and to appoint a successor to that officer by and with the advice and consent of the Senate." *Id.* at 327.

*Parsons* interpreted the statute in question in light of the great debate had by the First Congress in 1789 over the scope of the removal power. That Congress eventually concluded that the President could remove as of right those senior officials who served as his close advisors and confidants, because he should be allowed to delegate his authority only to those individuals in whom he had the greatest trust. Congress could check any abuse by the President by refusing to confirm (where confirmation was required) their replacements. *See Parsons v. United States*, 167 U.S. at 328–30. A district attorney, of course, does not have any direct contact with the President, but because the constitutional text was unclear, *Parsons* examined historical practice in holding for the President:

> Many distinguished lawyers originally had very different opinions in regard to this power from the one arrived at by this Congress, but when the question was alluded to in after years they recognized that the decision of Congress in 1789, and the universal practice of the Government under it, had settled the question beyond any power of alteration.

*Parsons v. United States*, 167 U.S. at 330.

19

Custom played a different role in the prior case of *In re Hennen*, 38 U.S. 230 (1839), where the question was whether District Courts, which had the statutory power to appoint their respective clerks, also had the implied statutory power to remove them. Presidential power was not thereby directly implicated, but the Court nonetheless did address the scope of his powers:

> Being responsible for the manner in which these high trusts are executed, [the President] must, from the very nature of things, be at liberty to employ and dismiss at pleasure those whom he employs as his agents. The laws, therefore, which create those departments, expressly recognize this relationship and this control.

> Widely different is the relation which subsists between the Court and its clerk. The latter is in no respect the agent of the former. His duties are prescribed by law. He gives bond to the United States for the security of those whose interests may be affected by his malconduct. The Court which appoints him is in no sense responsible to those who may be injured by his malpractices.

*In re Hennen*, 38 U.S. at 235.

*Hennen's* analysis is widely understood to be an essential feature of modern American constitutional law. See, e.g., *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (citing *Marbury v. Madison*, 5 U.S. 137, 176 (1803)) ("[T]he longstanding practice of the government can inform our determination of 'what the law is' in a separation-of-powers case."). Indeed, the role of these customary rules reveals the evident tension between *Parsons* and its cavalier treatment of *Marbury*. Marbury was appointed to a five-year term as a justice of the peace for the District of Columbia. Chief Justice Marshall held that Marbury could *not* be removed at will by the President of the United States since he had received a valid commission.

> The appointment of such an officer is complete when the President has nominated him to the senate, and the senate have advised and consented, and the President has signed the commission and delivered it to the secretary to be sealed. The President has then done with it; it becomes irrevocable. An appointment of a judge once completed, is made forever. He holds under the constitution. The

20

requisites to be performed by the secretary are ministerial, ascertained by law, and he has no discretion, but must perform them; there is no dispensing power. In contemplation of law they are as if done.

*Marbury v. Madison*, 5 U.S. at 151.

Justice Peckham, in *Parsons*, treated Marshall's specific determination as if it were dicta, because ultimately Marshall decided *Marbury* against the plaintiff by holding that Section 13 of the Judiciary Act of 1789 was void insofar as it purported to confer original jurisdiction on the Supreme Court under Article III, § 2 to hear Marbury's case. But Marshall's careful pronouncement on the finality of the commission was evidently meant not as dicta, but as a considered and authoritative statement designed to ensure the independence of the judiciary against meddling by the President. *See, e.g.*, Jed Handelsman Shugerman, *Presidential Removal: The Marbury Problem and the Madison Solutions,* 89 Fordham. L. Rev. 2085, 2090 (2021) ("[T]he first Congress understood that a fixed term of years for an office meant that either an officer could not be removed or that removal could be limited by conditions similar to requirements of high crimes and misdemeanors.")

The obvious parallel is to the appointment of Article III judges to lifetime terms in order to protect an independent judiciary—a system that could not survive if thereafter those judges could be removed by the President at will. Accordingly, *Parsons* has been criticized for overreaching in dealing with *Marbury*. *See*, Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1, 24 n.137 (2021). Indeed, a closer look at the two schemes shows that both *Parsons* and *Marbury* are correct within their respective spheres. At no point should staff attorneys in the Department of Justice be allowed to have operational independence from the commands of their superiors. But members of advisory boards, who carry out no executive decisions, must have such independence if they are to serve as a check on presidential and congressional ambition, by providing "independent advice and recommendations," as their respective Charters provide. Charters, Sects. 3.

Thus, properly understood, *Marbury's* holding regarding the finality of the commission is still good law. Nonetheless, the District Court in *Spicer* writes as if it were a dead letter after *Parsons*. It relied on a brief passage in *Myers v. United States*, *see Spicer*, 2021 WL 5769458, at *11, but *Myers* addressed only the President's "power of removing executive officers of the United States whom he has appointed by and with the advice and consent of the Senate." *Myers v. United States*, 272 U.S. at 106.

In *Myers*, Chief Justice Taft held only that the President had the power to remove unilaterally any such confirmed appointee, without drawing, as the Court did in *Hennen*, any distinction between senior officials who require senatorial consent and inferior officials who do not. Nor did Taft once address the enomrous gap between independent judges and mid-level executive branch employees. Thus, notwithstanding the analysis of the D.D.C., *Myers* does not address, let alone answer, the essential question in this case. *See Spicer*, 2021 WL 5769458, at *11–13; *see also Severino*, 2022 WL 168321, at 11 (following *Spicer*). It is worth noting the Brandeis dissent in *Myers* took *Marbury* as good law, *Myers v. United States*, 272 U.S. at 242–43, and that Taft's historical research in *Myers* has been questioned. See John Manning, which rejects *Myers's* reading of the Appointment Clause's "open-ended language." John Manning, *Separation of Powers as Ordinary Interpretation*, 124 Harv. L. Rev. 1939, 1971(2011). *Spicer* therefore represents a serious overreading of *Myers.*

*Myers* stated that *Parsons* should be read as overruling *Marbury* if the remark was "more than a dictum." *Myers v. United States*, 272 U.S. at 143. But it is highly improbable that *Parsons* would have silently overruled *Marbury*. Nonetheless, the court in *Spicer* improvidently dismisses *Marbury* as bad law, and is thus wrong on two grounds. First, Marbury remains good law with respect to term appointments for judges. Second, that this entire dispute has absolutely nothing whatsoever to do with Boards of Visitors that exercise no administrative or executive power. Indeed, *Seila* only reexamined *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935), which had approved the creation of independent agencies, in obvious tension with *Myers*, by holding that the creation of these "quasi-legislative" and "quasi-judicial" boards blocked the President's

22

power of removal. *Id.* at 624. *Seila* carved an exception to that rule in the case of agencies run by a single person wielding significant executive authority, which the Court held *did* violate the separation of powers principle even if the creation of a five-member commission *did not*. *Spicer* is wholly incorrect to assume that *Seila* covers Boards of Visitors that have no administrative or executive powers.

The same is true of other cases referred to in *Spicer, see* 2021 WL 5769458, at \*4-\*5, and *Severino* that deal with the implied creation of a removal power. Thus, in *Kalaris v. Donavan*, 697 F.2d 376 (D.C. Cir. 1983), Judge J. Skelly Wright held that the Secretary of Labor had the unqualified discretion to dismiss an administrative law judge who heard claims for federal worker's compensation under the Longshoremen's and Harbor Workers' Compensation Act of 1927. 44 Stat. 1424, *as amended,* 33 U.S.C. § 901 *et seq.* (1976 & Supp. IV 1980). *Kalaris* gave full force and effect to a regulation that allowed for a dismissal without hearing for cause, stating: "We hold to the long-standing rule that in the face of congressional silence all inferior officers of the United States serve at the discretion of their appointing officer." *Kalaris v. Donavan*, at 381. Long-time practice prevailed.

As it did in *Carlucci v. Doe*, 488 U.S. 93 (1988), which held that the National Security Act of 1959, 50 U.S.C. § 402 (1959), empowered the Secretary of Defense or his designee to create an organizational chart that it could then staff with employees "as may be necessary to carry out the functions of such agency." The Secretary delegated that power to the NSA director, who issued regulations covering both the hiring and removal of agents. "Although the 1959 NSA Act does not refer to termination, the Court has held, *as a matter of statutory interpretation*, that, absent a specific provision to the contrary, the power of removal from office is incident to the power of appointment." *Carlucci v. Doe*, at 99 (citing *Keim v. United States*, 177 U.S. 290, 293 (1900)) (internal quotations removed) (emphasis added). It thus was clear that the NSA director was not bound to issue those regulations, but there are good institutional reasons why the standard at-will power of dismissal *should* be allowed in a work environment as sensitive as national security.

But the principles of statutory interpretation that cut one way in *Kalaris* cut the opposite way here given the statutory commitment calling for independent advice by the members of the respective BOVs.

What links together these disparate cases is that long-standing interpretations of any given provision, whether by regulation or common practice, are entitled to respect throughout constitutional, administrative, and contact law. Thus, in *United States v. Alabama G.S. R Co.*, 142 U.S. 615, 621 (1892), the Supreme Court summarized the basic position as follows:

> It is a settled doctrine of this court that in case of ambiguity the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties who have contracted with the government upon the faith of such construction may be prejudiced.

Just that disfavored outcome happened here, where the President has disregarded a uniform practice that blocked the unilateral dismissal of members of these Boards of Visitors without cause.

This point received a backhanded acknowledgement when Anthony McDonald, the DFO for the USAFA BOV wrote these words of assurance to Plaintiffs Stirrup, Lengenfelder, and Gleason:

> You will likely hear about advisory committees being disestablished and board members released from service **but given our committee is non-discretionary (required by law) it will remain in place and *your board membership will not be impacted.***

Ex. G (emphasis added).[17]

### C.   Plaintiffs Stirrup, Lengenfelder, and Gleason Have Stated a Claim for Breach of Contract.

The next ploy of the Defendants is to argue that these Plaintiffs have not pleaded a cause of action for breach of contract. That argument is peculiar because first the Defendants make two independent arguments. The first is that there is no agreement at all. Def. Br. at 30. The second is that *if* there is a contract, it is a contract for employment at will, for which the remedy of specific performance is not awarded. Given the distinctive niche of the BOVs, the Government is wrong on both counts.

First, the initial appointment has to be a contract. As with all new positions, a prior President made an offer to appoint members to the various BOVs, but those appointments only took effect after they were accepted by the prospective member of the BOV. Consideration for the contract was provided by the appointees by their promising to serve, swearing an oath to serve under the terms of the oath, and commencing to serve. It does not matter whether this appointment is called a contract, for the test is one of substance not form, and these appointments operate as offers that are then accepted. How else could they be created? The breach occurred when the President sought unilaterally to sack these parties, falsely claiming that their appointments were at-will.

For members of the independent Boards, this is no more legal than it would be for the President to fire members of the federal courts at will on the ground that he had appointed them. Judges and board members have distinctive roles, as do members of independent agencies. But the independence of each can only be preserved if the President cannot remove them at will.

---

[17]   Beyond the obvious admissions contained in McDonald's communication lies the equally obvious, but in his case, unrecognized implication that a suspended Board that strips all of its members of their statutory duties and obligations is utterly inconsistent with the regulatory definition of a "non-discretionary Board." We discuss this point further in Part II.B, *infra.*

Restoration to their former position is the only proper remedy, given that the President's actions were so blatant that they amount to a deprivation of a valid right without offering any of due process of law required under the Fifth Amendment to the Constitution.

Given that these appointments are validly created, the Defendants then rely on this basic rule: "An employer may not obtain specific performance of the employee's promise to work." Restatement (Third) of Employment Law § 908(a) (2015): see generally, Christopher T. Wonnell, *The Contractual Disempowerment of Employees*, 46 STAN. L. REV. 87, 115, 145 (1993). *See* Def. Br. at 32. But these appointments are neither personal service nor employment contracts, because BOV members are neither. As they are, by charter, independent board members, the president and his subordinates have no power to control their activities, which is to provide a soft check on presidential power, and not a way for the president to unilaterally aggrandize his own position.

There are clear practical reasons for maintaining this critical distinction.

One reason not to award specific performance to any employee is his or her retention can easily disrupt the chain of command, so that unlike contracts for the outright transfer of real property, the effective enforcement of this remedy requires constant judicial supervision to see that the employee does not deviate from the terms of his or her engagement. Those same concerns motivate the decision not to award specific performance to inferior government employee within the executive branch. And with government contracts, the standard government appointments, the uniform practice appears to be that no damages are awarded when these officers are dismissed before the end of their contractual term, as held in *Parsons*, for it is assumed that these highly qualified employees can find work elsewhere at suitable rates of compensation. In addition, that burden of setting compensation would be especially heavy whenever, as during a transition to a new Administration, all sitting U.S. Attorneys routinely hand in their resignations to give the new President room to fashion his Administration. See, e.g., Evan Perez and Christian Carrega, "DOJ asks Trump-appointed US attorneys to resign," CNN

Politics, February 9, 2021, https://www.cnn.com/2021/02/08/politics/leftover-trump-us-attorneys/index.html, noting that in 2017 "then-Attorney General Jeff Sessions asked 46 Obama-appointed US attorneys to submit their resignations."

In contrast with these organizations, the BOV's hallmark is statutory independence, not subservience. Its members possess much of the independence of judges and none of the characteristics of administrative officers. Hence, it should come as no surprise, that the *uniform* practice is that *no* president *ever* has successfully exercised the power to remove any member of any visiting board—including others that have nothing to do with the Service Academies. The closest situation to the present came in 1983 when President Ronald Reagan sought to remove three members of the Civil Rights Commission, as recounted by Professor Adrian Vermeule, *Conventions of Agency Independence*, 113 Colum. L. Rev. 1163, 1199–1201 (2013) (cited by the Defendants in their brief at 25, dealing only with *Parsons*, not the Civil Rights Commission). The Reagan administration had maintained that it was free to do so, even though it never anticipated the *Buckley* appointments issue. *Id.* at 1201, n. 153. But politically the President was outdone. The holdover members refused to resign, and no new appointees were approved by the Senate. The outcome was the passage of new legislation which gave the President the power to appoint four of the eight commission members, with two each for the House and Senate. As Vermeule concluded, "The long-run effect of the episode was to cause Congress to transform the convention of the Commission into a formal legal rule." *Id.* at 1201.

In this case, *both* the long-term convention and the statutes point to the inability of the President to remove BOV members. The structure of the Civil Rights Commission; *see* 42 U.S.C. § 1975(e); is identical to that which is involved here, and its purpose was to preclude any form of presidential bullying. Sadly, this institutional message never reached the Biden administration, which instituted this new and deviant practice, not only for the Service Academies, but across his entire administration. He thus has issued similar letters to dismiss other Trump appointees to other commissions. He summarily removed Trump appointees to the National Capital Planning Commission that oversees real estate development in and around

Washington D.C. Peggy McGlone, "Biden removes Trump appointees from boards that shape the District," Washington Post, February 10, 2021, https://www.washingtonpost.com/entertainment/ biden-removes-trump-appointees/2021/02/10/ 6b449a90–6ba9–11eb-9f80–3d7646ce1bc0_story.html. Similarly, he used the same ultimatum letter to remove the members of the United States Commission of Fine Arts, including its chairman, Justin Shubow. *See* Wallace Ludel, "President Joe Biden removes Trump appointees from US Commission of Fine Arts," The Art Newspaper, May 25, 2021, available at https://www.theartnewspaper.com/2021/05/25/president-joe-biden-removes-trump-appointees-from-us-commission-of-fine-arts. The Commission chair, Justin Shubow, noted that "In the Commission's 110-year history, no commissioner has ever been removed by a President, let alone the commission's chairman." Indeed, the key system of staggered terms was religiously preserved when Congress reenacted the provision in 1980, Pub. L. No. 96–579, § 13(a) (Dec. 23, 1980); 1996, Pub. L. No. 104–106, Div. A, Title X, § 1061(e)(2), Title XV, § 1502(a)(12) (Feb. 10, 1996), and 1999, Pub. L. No. 106–65, Div. A, Title X, § 1067(1) (Oct. 5, 1999).

Against this historical backdrop, the explicit reliance on standard practice in *Parsons* cuts against President Biden's decision to terminate members of the BOVs, which goes against *all* previous practice. Practice need not be an infallible tool, for other functional imperatives could weigh heavily in the opposite direction. But here uniform practice only reinforces the customary distinctions between Executive Branch officers and independent advisory boards. To begin with, the district attorney in *Parsons* was clearly within the chain of command. His removal and replacement only served to ensure an orderly transition of power up and down the line. But the purpose of an advisory committee is not to execute commands, but to give independent advice on the many issues pressing the service academies, not only to the President but (as with the USAFA BOV) to the heads the Senate Armed Service Committee and the House Armed Service Committee. These documents are also part of the public record, as they are published on the FACA website and must be provided to the Library of Congress for public reading. Thus, the unilateral decision of the President to suppress these reports prevents the dissemination of

information to other actors in the political system whose actions may often constitute an important check on presidential power. When the President deactivates portions of the Committees, he not only cuts off advice for himself, but from the Legislative Branch and the public at large.

### D. The Third Amended Complaint States a Well-Pleaded Claim of Viewpoint Discrimination Under the First Amendment.

In most instances, the Defendants are surely correct to say that the function of a President is to make his case to the public, trusting that other parties who disagree with his views will be able to speak out in turn with their arguments in opposition. The Defendants are also correct to argue that the government is in a position to place restraints on what government employees may say relating to their work. See, e.g., *Connick v. Myers*, 461 U.S. 138 (1983). But in this case, the President is bound to respect the independence of the BOV as created by Congress, and as such, he is not in a position to invoke any partisan political activities to undermine Board effectiveness. But that is what he has done by claiming that he has the right to replace members of the BOV in order to have people on the Boards that "share his values," a partisan assertion that simply cannot be reconciled with the regulatory mandates that BOV's "be fairly balanced in its membership in terms of the points of view represented and the functions to be performed;" 41 C.F.R. § 102–3.30(c); and that the Secretary of Defense, as agency head of the DoD, must "[d]evelop procedures to assure that the advice or recommendations of advisory committees will not be inappropriately ***influenced by the appointing authority or by any special interest***, but will instead be the result of the advisory committee's ***independent judgment***." *Id.*, § 102–3.105(g) (emphasis added).

The Defendants make the odd factual argument that the Plaintiffs have not pleaded that the President has behaved with improper motive. But that gap is easily remedied, for his Press Secretary made that exact claim in her public justification for his actions. Surely there is no better reflection of the Administration's ideological bias against the terminated members than her

indefensible assertion that they deserved to be punished for standing "idly by" during the events at the Capitol on January 6, 2021. *See* Chris Cameron, "White House Forces Out Trump Appointees From Boards of Military Academies," NY Times (Sept. 8, 2021), https://www.nytimes.com/2021/09/08/us/politics/trump-appointees-military-academy-boards.html. The statement is particularly egregious because the President chastises these Board members for not taking official positions on matters outside their purview. Indeed, it might have been a more egregious offense for any Board member to take an official public position on these extraneous matters.

The situation is no better when his Press Secretary Jen Psaki also announced baldly that the President acted properly:

> The President's objective is what any president's objective is, which was to ensure that you have nominees and people serving on these boards who are qualified to serve on them and who are aligned with your values.

*See* Chelsey Cox, "Biden administration begins removing Trump appointees from military academy boards," USA Today, September 8, 2021, https://www.usatoday.com/story/news/politics/2021/09/08/biden-tells-trump-appointees-military-academy-boards-resign/5776909001/.

She is wrong in every particular. The President's objective in this instance was **not** "what any President's objective" is, for no President before Biden (including Donald Trump) sought to turn every BOV into a political commissar squad in the direct service of the Executive Branch. And it would be preposterous to say that the members of these BOVs were somehow unqualified to serve when she does not offer a single bit of evidence to support that contention. It is wholly improper in this context to undermine the guaranteed independence of the Boards by seeking either to immobilize their operation or stack them with pro-Administration partisans. In dealing with BOV members, the President is not a political actor. Just as he could not remove judges

from the Article III courts by noting he disagreed with their views, so he cannot do so here either. His impermissible speech is conclusive evidence that he violated his constitutional duty to respect BOV independence for partisan ends.

### E. The Disposed Members of the Board Appointed by the President Should Be Restored to Their Positions and Their Terms Extended So That They Can Continue to Serve Terms of Their Original Length.

One remaining difficulty concerns the kind of relief that should be granted. The unlawful removal of Board members by the current President has two undesirable consequences. First, it has shortened the term of the sitting presidential board members if the only remedy is to restore them to their respective positions for the duration of their original terms, so that they will not be able to serve for the full three years. In order to prevent such abuse, it is appropriate to extend their terms for the full amount of time their membership on the BOV was unlawfully suspended/terminated, so that the sitting President is not in a position to profit from his own wrongful effort to disband, *de facto*, the BOVs. In effect, the correct solution thus requires that current BOV members should have their current terms extended to make up for the time that the operation of the various Boards have been suspended when, for a period of time, their memberships on the Boards have been terminated.

Second, the decision to suspend operations of the BOVs undermines the positions of the BOV members and makes it clear that full relief is not possible unless the order protects the nine congressional members of the BOV, all of whom now find it impossible to participate in BOV's activities. Nothing in the Plaintiffs' prayer for relief asks for any adjustments to be made in the terms of the nine congressional appointments, all of whom serve on an annual basis. It is not possible to extend their terms without interfering with the annual selection by the President Pro Tempore of the Senate and the Speaker of the House. But even if individual rectification is not possible, it is critical to make sure that this abuse will not recur annually in the future, yet evade review. Thus, any court order should require that the President not interfere with the traditional

31

operation of the BOV by ever taking it upon himself to remove the presidential appointees or suspend operations of the BOVs. The passage of time has given the President unlawful leverage. It has, for example, made it impossible for any member of any of the BOVs to attend the BOV meetings that should have taken place during the suspension. A general injunction that covers all future appointments is the only way to protect the functions of all 15 Board members for each of the Service Academies going forward.

## II.   THE CLAIMS BY ALL PLAINTIFFS THAT DEFENDANT AUSTIN WRONGFULLY SUSPENDED THE SERVICE ACADEMY BOVs SHOULD BE HEARD BY THIS COURT AND MOVE FORWARD.

### A.   This Court Has Jurisdiction Over Plaintiffs' Challenge to the Suspensions.

Defendants' assertions that all Plaintiffs lack standing to challenge Secretary Austin's unilateral and illegal suspension of the BOVs because "that ship has already sailed" are without merit for the reasons that follow.

#### 1.   The Wrongful Suspensions Are Capable of Repetition but Evading Review.

Defendants assert that this Court lacks jurisdiction to declare the suspensions unlawful or to enjoin any further such suspension because the entire matter is moot now that the BOVs have supposedly been reinstated. However, while the suspensions were ended *de jure* on September 17, 2021, the USMA BOV and the USAFA BOV have not yet met, and their members have not been allowed to engage in their mandated and normal activities during this *de facto* suspension. Moreover, these cases can hardly be regarded as moot given that the presidential board members claim that they are entitled to a restoration of their seats for the duration of their respective terms. Likewise, the Plaintiffs also seek a general declaration that prevents a repetition of the unlawful suspensions by the current President and all future Presidents, which is a live request.

Yet even if those issues were to disappear in this case, they would remain live in future cases. In *Roe v. Wade*, 410 U.S. 113 (1973), the Supreme Court did not hold that the ongoing litigation was moot because the individual plaintiff's pregnancy had run to term. The issue of a constitutional right to an abortion was sure to occur in future cases, which would present the identical issue. Just that will happen here if the President can adopt this ploy in case after case because his unlawful actions are deemed beyond judicial challenge. Thus, the suit must be allowed given the long-term institutional importance of the issue.

### 2.   The Suspensions Were Final Agency Actions.

Here Defendants engage in a bit of Three Card Monty in attempting to focus the Court's attention on the DoD's so-called "zero-based review" rather than the actual agency action for which that sham served as pretext: the unlawful suspension of the BOVs. It cannot possibly be disputed that the suspensions were anything other than a final agency action; were it otherwise, the Secretary of Defense could start and stop the operations of these Boards at his whim and sole discretion, claiming each time that each suspension was simply an "interim measure" taken to effect some equally pretextual purpose; i.e., a false statement that covers up the true reason in order to avoid the consequences of content.

This case is now in a perfect position for litigation because there are parties who can supply the needed relief, including the Designated Federal Officers joined in the Fourth Amended Complaint, for which Plaintiffs seek leave to file concurrently with this Opposition brief. All of the relevant information is readily available or easily subject to discovery. Postponement will not sharpen the litigation, but it will allow the wrongs that have taken place to fester and grow. Nor is the issue of finality of the slightest relevance here. Finality is a valuable procedural safeguard that means that a particular rule cannot be challenged until it has been given legal effect. But in this case, the suspension is already in effect, and it would create an impossible situation to allow

the status quo ante to prevail solely because the government agency refuses to acknowledge that the system has gone haywire. There will be constant strategic shifts in position by the Defendants over time, but none of these will obscure the basic issue.

### B.   Defendant Austin Had No Statutory Authority to Suspend the BOVs.

The Third Amended Complaint ("TAC") sets forth the congressional mandates for meetings of the BOVs. *See, e.g.*, TAC ¶¶ 67, 103, and 119. And each of the Charters, under the subheading "Duration," plainly states that "[t]he need for the Board[s] is on a continuing basis." *Id.*, ¶¶ 73, 106, and 122. Nothing in the statutes, the Charters, or the AFA BOV's Bylaws authorizes the Secretary of Defense, the service secretaries, or the DFOs to unilaterally overrule the meeting and continuous-operation requirements mandated by Congress, the Charters, and the Bylaws. As previously noted, Defendants have violated these proscriptions given that the USMA Board has not met at all since December 1, 2020, and the USAFA Board has not met at all since November 18, 2020.

Defendants assert that the Secretary of Defense's authority to flout the will of Congress and suspend BOVs that are statutorily required not only to meet, but to carry out myriad other duties and responsibilities, somehow derives from the DFOs' authority to call or adjourn BOV meetings. Def. Br. at 40–41. The argument is absurd on its face; whether a DFO has the authority to adjourn a particular meeting has nothing to do with the Secretary's outright suspension of the Boards and their functions in their entirety.

Defendants also fail to acknowledge that the Secretary's unlawful suspensions did not simply prevent the Boards from meeting; the suspensions also stripped the Boards and its members from carrying out many other statutorily mandated requirements, all of which are set forth in detail in the TAC. *See, e.g.*, TAC ¶¶ 18, 55–61, 81, 97, 115, 131. The Defendants then further insist that the inability of the Plaintiffs to weigh in on key "critical decisions," *see* Def. Brief, at 40, n. 15, is "not relevant" to the case because the "Boards would have had no role in the actual decision-

making process." But this cavalier treatment thoroughly misses the point. The members of these Boards are not officers subject to presidential dismissal *precisely because* they have no operational authority that subjects them to presidential control, and the contrast to corporate boards of directors only strengthens the point. At every point, the Defendants cite to employment cases, wholly ignoring that under *Buckley*, which they never mention, these individuals cannot be regarded as officers of the United States. *See* Part I.B., *supra*.

Defendants also urge that the Secretary's pretextual purpose for the suspensions somehow vested him with authority to carry them out. The Defendants point to the FACA and one of its implementing regulations, 41 C.F.R. § 102–3.50, which provides, in pertinent part:

> FACA identifies four sources of authority for establishing an advisory committee:
>
> (a) ***Required by statute.*** By law where the Congress establishes an advisory committee, or specifically directs the President or an agency to establish it (*non-discretionary*).

41 C.F.R. § 102–3.50.

The Defendants are surely correct that the BOVs are all required by statute. But given that their formation is *non-discretionary*, it is a non sequitur to say that this benign generality vested the Secretary of Defense with the authority to suspend the operations of these BOVs in order to conduct a "zero-based review." Def. Br. at 5. Quite to the contrary, DoDI 5105.04 defines a "Non-Discretionary Advisory Committee" as:

> Any committee required by statute or Presidential Directive. A Non-Discretionary Advisory Committee that is required by statute is generally identified by name, purpose, or functions, ***and its establishment or termination is beyond the legal discretion of the Secretary of Defense.***

*Id*., Enclosure 2, ¶ E2.17 (emphasis added).

Thus, the Government's pretextual ruse is wholly transparent. If needed, this reexamination could and should take place while the BOVs continued to operate as required by statute *before* making any fundamental changes in Board composition or operation. Indeed, any such review will be far better if it consults with present Board members, whose input could make any implementation both more informed and more gradual. *See* TAC, ¶ 17.

Worse still, the Secretary of Defense's supposed review was an entire sham. At no point did Defendant Austin publish or state any reasons for the review. *Id*. At no point did he list any sources of difficulty in the current Board operations or point to any complaints about the then operations of the Boards. And now that the review is ostensibly completed, Defendant Austin did not publish a report that indicated the rationales for the supposed changes in question. In the utter absence of any information about the organization and content of that zero-based review, it is hard to believe that any standard review was carried out at all.

Finally, under 10 U.S.C. §§ 7455(d), 8468(d), and 9455(d), the BOVs have a carefully regulated regime that calls for the Boards to visit the service academies annually and make additional visits with the approval of the respective service secretaries. The Secretary of the Air Force is also subject to strong duties of "candid and complete disclosure" needed for the AFA BOV to prepare its various reports. 10 U.S.C. § 9455(e)(2). Throughout, the Boards operate as a unitary body under Subsections 7455(d)(2), 8468(d)(2), and 9455(d)(2) of the statutes and not as a set of discrete and independent individuals thrown together at random. Like all such governing boards, their operations require a quorum set not by statute but, under standard practice, by the Boards themselves. Hence, all features of the Boards' composition and operation do not lie within the purview of Defense Secretary Austin. Secretary Austin therefore does not have the power to suspend all Board activities by having his underling send, as he did on February 4, 2021, a suspension notice that renders it practically impossible for the Boards to discharge their collective functions.

### III.   THE CLAIMS BY ALL PLAINTIFF CHALLENGING DEFENDANT AUSTIN'S ILLEGAL "PACKING" OF THE BOVs SHOULD BE HEARD BY THIS COURT AND MOVE FORWARD.

#### A.   All Plaintiffs Have Standing to Challenge Defendant Austin's Illegal Effort to Pack the Boards.

Here Defendants are once again whistling past the graveyard as to the gravamen of Plaintiffs' Third Amended Complaint and their proposed Fourth Amendment Complaint: that the three wrongs complained of—the suspensions, the terminations, and the functional equivalent of "court-packing"—are all of a piece. Their overarching, singular purpose and goal is to transform balanced, independent, non-partisan, non-discretionary advisory boards into squads of political operatives whose "values" align with the President's and where all contrary or dissenting views are silenced and eliminated. Each and every one of the Plaintiffs has suffered an injury-in-fact as a direct result of those machinations and actions. Plaintiff Stirrups' efforts to continue her oversight of any number of controversies brewing at the Air Force Academy were stymied at every turn by the suspensions. *See* TAC, ¶¶ 51, 53–56. She was "rewarded" for those efforts by being terminated by the President, along with Plaintiffs Lengenfelder, Gleason, and Spicer. Those terminations were motivated in large part by viewpoint discrimination, the same viewpoint discrimination that lies at the heart of Secretary Austin's intentions to pack the Boards with additional individuals selected solely by him or his Deputy, including non-members of the BOVs.

It is of no moment to suggest that, because the First Amendment harms presented by the Secretary's Board-packing plans have not yet come to fruition, the harms are purely speculative and non-actionable. In *Elrod v. Burns*, 427 U.S. 347 (1976), noncivil service employees of the Cook County, Illinois, sheriff's office brought a class action against so-called "patronage dismissals," alleging that they were fired or threatened with dismissal because they were not affiliated with or sponsored by the political party of the current county sheriff. The Court found

that the dismissals and *threatened dismissals* violated the plaintiffs' rights of free assembly and free expression under the First Amendment. As to the question of whether a preliminary injunction was justified, even in the face of *prospective dismissal*, the Court held:

> At the time a preliminary injunction was sought in the District Court, one of the respondents was only threatened with discharge. In addition, many of the members of the class respondents were seeking to have certified prior to the dismissal of their complaint were threatened with discharge or had agreed to provide support for the Democratic Party in order to avoid discharge. ***It is clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.*** *See New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Since such injury was both threatened and occurring at the time of respondents' motion and since respondents sufficiently demonstrated a probability of success on the merits, the Court of Appeals might properly have held that the District Court abused its discretion in denying preliminary injunctive relief. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963).

*Elrod v. Burns*, 427 U.S. at 373 (emphasis added).

The action threatened here—packing the BOVs with non-members of the Boards and thus not authorized by Congress—poses no less a potential threat to the First Amendment rights of Plaintiffs. And the notion that the terminated Plaintiffs no longer have standing to complain about such a threat would stand only for the proposition that a President and a Secretary of Defense can immunize themselves from First Amendment claims simply by firing the people who might later make them.

Our discussion of the merits in Subsection C, *infra*, further touches on the real harms at issue here.

### B.    The Board-Packing Claims are Justiciable.

The Plaintiffs' complaints cannot be dismissed on the grounds that they are not justiciable, see Def. Brief at 38, for they are indeed capable of being settled by a judicial action. As just previously explained, the gravamen of the Third and Fourth Amended Complaints is that the Secretary of Defense has stacked the deck by authorizing the creation of subcommittees to the BOVs and insisting that he can appoint subcommittees with individuals that are not members of the particular boards, a claim that should be adjudicated on the merits. *See* Subsection C, *infra*. So long, therefore, as the Plaintiffs seek an injunction against the continuation of this illegal practice, the Court is in a position of settling the dispute by supplying the requested remedy. The controversy here does not arise "from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot." *Aetna Life Ins. Co v. Haworth*, 300 U.S. 227, 240 (1937). Indeed, in this case, "the controversy [is] definite and concrete, touching the legal relations of parties having adverse legal interests." *Id.* at 240–41. The Defendants claim that the Plaintiffs have not established any injury in fact. Def. Brief at 42. But the point is wholly frivolous given that the Plaintiffs have been stripped at the very least of a substantial fraction of their statutory duties. Those losses count as real harms, for they deprive the Plaintiffs of opportunities to serve their country, to gain experience in public affairs, and interact and network with other individuals with common interests and abilities. Any arguments that the Defendants wish to raise against this request goes to the merits, not to the justiciability of the claim.

### C.    Defendant Austin Has No Statutory Authority to Increase the Number and Composition of BOV Members Through the Artifice of "Subcommittees."

The crude ploy adopted by the Department of Defense is to place individuals who are not on the BOVs on so-called subcommittees appointed by officials in the Department of Defense. This transparent evasion is not authorized by Congress. To allow it to continue is to countenance the undermining of the Board's institutional integrity mandated by statute. We know of no

organization that allows subcommittees of the organization to be created and members of those subcommittees to be named by outsiders or that allows or requires non-members of the organization to serve on subcommittees of the organization. The moment an outside agent dilutes or takes over the control of any board, its internal processes are necessarily gutted. No longer are the members of the Board equal because now the outsider can designate "subcommittees" and insist that they report only to him. If that happens, the Board ceases to be the self-contained and independent agency created by Congress. Any unwanted Board members can simply be shunted aside, their voices effectively silenced and influence neutered. The situation resembles that in *Dartmouth Coll. v. Woodward*, 17 U.S. 518 (1819), where Chief Justice Marshall refused to countenance a scheme whereby New Hampshire gutted the Royal Charter given to Dartmouth College by creating a new governing board. Marshall held that the Charter's modification violated the constitutional guarantee that no state may take any action "impairing the obligation of Contracts." U.S. Const., art. I, § 10. These federal actions involve the parallel destruction of this statutory scheme.

Nonetheless, on September 17, 2021, Secretary Austin issued a memorandum to the Secretary of the Air Force that made a mockery of the entire statutory scheme.[18] He first insisted that:

> Although membership size for DoD Federal advisory committees is prescribed by Secretary of Defense established policy, membership size and appointment authority for the USAFA BOV is set forth in a statute. DoD previously determined that subcommittees are not authorized for the USAFA BOV. While I support this earlier decision, you are delegated authority to establish USAFA BOV subcommittees if you determine such action is essential to USAFA BOV operations. However, parent and subcommittee member appointments are separate and distinct. Therefore, authority to invite or appoint USAFA BOV subcommittee members rests solely with the Secretary of Defense or the Deputy

---

[18]    As previously noted, Defendant Austin issued substantially similar memoranda to the Secretary of the Army and the Secretary of the Navy. *See* Ex. E.

Secretary of Defense. Subcommittee members are appointed for a term of service of one-to-four years, with annual renewals, and subcommittee leadership terms of service are limited to one-to-two years, with annual renewal.

Exhibit E.

As an initial matter, the paragraph contains the rather astonishing admission that the Department of Defense had previously determined that subcommittees were *not authorized*, an "earlier decision" Defendant Austin "support[s]." And yet his next words amount to saying, "But I am going to do it anyway, the lack of authority be damned." A second incurable mistake in this paragraph is to define a subcommittee in a way that is not supported by any known authority. Every legal dictionary that Plaintiffs have consulted says the same thing. The Collins Dictionary Provides that "a subcommittee is a small committee made up of members of a larger committee." https://www.collinsdictionary.com/dictionary/english/subcommittee. Google Dictionary, the general google reference for all dictionaries states that a subcommittee is a "a committee composed of some members of a larger committee, board, or other body and reporting to it." *Subcommittee*, Google Dictionary, https://perma.cc/J952-RVC7. Yet in his memoranda, Secretary Austin allows the secretaries of the Air Force, Army, and Navy to appoint any person, ***whether or not a member of the BOV***, to these subcommittees. He uses, without citation or documentation, the flimsy excuse that the appointments to the parent and subcommittees are "separate and distinct," but they are not. Indeed, and directly to the contrary, DoDI 5105.04, Paragraph 5.6.2 expressly states that the DFO "***shall*** . . . [e]nsure that ***no*** DoD-Supported Committee establishes Subcommittees ***unless specifically authorized by statute, executive order, or the Committee's Charter***." DoDI 5105.04, ¶ 5.6.2 (emphasis added). Moreover, Article III, Section 5 of the USAFA BOV's Bylaws permits the Secretary of the Air Force to, "when necessary and consistent with the Board's mission and DoD policies and procedures, create subcommittees *of the parent committee (the Board)*." (Emphasis added.) Defendants quote this very provision in their brief, Def. Br. at 4–5, but clearly fail to grasp its significance. Nothing in the DoDI, the statutes, the Charters, or the Bylaws authorizes the Secretary of Defense of the

Deputy Secretary of Defense to authorize the creation of BOV subcommittees or to appoint additional persons to any subcommittee of the Board. Thus, in one illegal action Defendant Austin allows the secretaries of the services to circumvent Congress' structure for the BOVs of each of the Service Academies, so that they have no discernible independent function at all. That unilateral decision is flatly inconsistent with the text of the Constitution, the governing statute, and the uniform practice followed by every President.

## CONCLUSION

Defendants' Motion to Dismiss should not be granted.


Respectfully submitted,

Dated: February 28, 2022          By:   /s/ Jeffrey McFadden

Jeffrey E. McFadden

(DC. Bar No. 434234)
LAW OFFICES OF JEFFREY E.
MCFADDEN, LLC
312 Prospect Bay Drive East
Grasonville, MD 21638
Phone: (410) 490-1163
jmcfadden@jmcfaddenlaw.com

*/s/ Michael T. Rose*
Michael T. Rose
(S.C. Bar #4910)
(Admitted pro hac vice)
MIKE ROSE LAW FIRM, PC
409 Central Ave.
Summerville, SC 29483
Phone: (843) 871-1821
mike@mikeroselawfirm.com

*/s/ Richard A. Epstein*
Richard A. Epstein
(CA Bar #43329)
(Admitted pro hac vice)
16 Thomas Place
Norwalk, CT 06853
Phone: (773) 450-4476
raepstein43@gmail.com

*Attorneys for Plaintiffs*