# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HEIDI STIRRUP, *et al.*

*Plaintiffs,*

*v.*

U.S. DEPARTMENT OF DEFENSE, *et al.,*

*Defendants.*

Civil Action No. 1:21-cv-1893 (TJK)

## <u>DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM</u>

Defendants move to dismiss the Fourth Amended Complaint, ECF No. 37, for lack of subject matter jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively.  For the reasons below, Defendants' motion should be granted and the case should be dismissed.  A proposed order is attached.

Dated: May 9, 2022

Respectfully    submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

CHRISTOPHER R. HALL
*Assistant Branch Director*

<u>/s/ Madeline M. McMahon</u>
MADELINE M. MCMAHON
(DC Bar No. 1720813)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530

Telephone: (202) 451-7722
Email: madeline.m.mcmahon@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEIDI STIRRUP, *et al.* | |
| *Plaintiffs*, | |
| *v.* | Civil Action No. 1:21-cv-1893 (TJK) |
| U.S. DEPARTMENT OF DEFENSE, *et al.*, | |
| *Defendants.* | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF THEIR MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

BACKGROUND..................................................................................................................3

I.      The Board of Visitors to the Air Force Academy      ...................................3

II.     The Board of Visitors to the Naval Academy and the Military Academy ...................5

III.    The Board of Visitors' Zero-Based Review ...................................................5

IV.     The Appointment and Removal of Plaintiffs Stirrup, Lengenfelder, and Gleason
        From the Board ....................................................................................................7

V.      The White House Presidential Personnel Office...................................................8

VI.     Present Litigation................................................................................................9

LEGAL STANDARD ........................................................................................................9

ARGUMENT .....................................................................................................................10

I.      Plaintiffs' Claims Challenging the Removal of Stirrup, Lengenfelder, and Gleason
        From the Air Force Academy Board Should Be Dismissed ...................................12

        A.      Plaintiffs have no standing to challenge the removal of Plaintiffs
                Stirrup, Lengenfelder, and Gleason because their harms are not
                redressable....................................................................................................12

                1.      *Federal courts lack jurisdiction to subject the President to injunctive or declaratory relief.*.13

                2.      *Injunctive or declaratory relief against Defendants Russell or McDonald cannot redress any
                        alleged injuries attributable to Plaintiffs' removal.* ...................................16

        B.      The President may remove Board members at his discretion. ...............................20

                1.      *The power to remove an official from office is incidental to the power to appoint, absent
                        express limitations on the removal authority.*...................................................21

                2.      *The Supreme Court has established that fixed terms alone do not insulate officials from
                        removal.* ...............................................................................................23

                3.      *The constitutional avoidance canon further counsels against reading removal protections
                        into the statutes.*...................................................................................29

        C.      Plaintiffs Stirrup, Lengenfelder, and Gleason have failed to state a
                claim for breach of contract....................................................................................31

D.    Plaintiffs Stirrup, Lengenfelder, and Gleason have failed to allege that their removal was impermissible viewpoint discrimination. ..................................33

II.    Plaintiffs' Claims Challenging the Temporary Suspension of the Boards Should Be Dismissed. ..................................................................................................................35

A.    This Court has no jurisdiction over Plaintiffs' challenges to the Boards' suspensions. ..........................................................................................................35

1.    *Plaintiffs have no standing to seek declaratory and injunctive relief based on only past action.* ..............................................................................................35

2.    *Because the Board has been reinstated, any challenges to the Board suspension are moot.* ..................................................................................................................37

3.    *The zero-based review is not a final agency action and is not reviewable under the APA.* ...................................................................................................................40

B.    Plaintiffs have not made a proper showing that the Secretary lacked the authority to suspend advisory committees pending the zero-based review. ............................................................................................................41

C.    Plaintiffs have failed to allege that the suspension of the Boards constituted impermissible viewpoint discrimination. ...............................43

III.    Plaintiffs' Claims Challenging the Secretary's Decision to Approve Subcommittees Should Be Dismissed ..............................................................................................44

A.    This Court has no jurisdiction over Plaintiffs' challenges to the Secretary's decision allowing the Boards to form subcommittees. .....................44

1.    *Plaintiffs have no standing to challenge the Secretary's authorization of subcommittees because they have not established a concrete injury-in-fact.* .................................44

2.    *The Secretary's authorization of subcommittees is committed to agency discretion by law and not reviewable.* ........................................................................................45

B.    Plaintiffs have failed to allege sufficient facts to show that the Secretary unlawfully decided to establish subcommittees. ............................................46

C.    Plaintiffs have failed to allege that decision to permit subcommittees constituted impermissible viewpoint discrimination. ...............................47

CONCLUSION ................................................................................................................48

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967) .................................................................................................. 40, 41

*Al-Aulaqi v. Obama,*
   727 F. Supp. 2d 1 (D.D.C. 2010) ............................................................................ 18

*Almaqrami v. Pompeo,*
   933 F.3d 774 (D.C. Cir. 2019) ................................................................................ 37

*Alvarez v. Smith,*
   558 U.S. 87 (2009) .................................................................................................. 38

*Aracely, R. v. Nielsen,*
   319 F. Supp. 3d 110 (D.D.C. 2018) ........................................................................ 33

*Armstrong v. Bush,*
   924 F.2d 282 (D.C. Cir. 1991) ................................................................................ 23

*Armstrong v. Exec. Off. of the President,*
   90 F.3d 553 (D.C. Cir. 1996) .................................................................................. 17

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ......................................................................................... *passim*

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
   997 F.2d 898 (D.C. Cir. 1993) ................................................................................ 17

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ....................................................................................... 10, 33, 39

*Bennett v. Spear,*
   520 U.S. 154–78 (1997) .......................................................................................... 40

*Boyle v. United Tech. Corp.,*
   487 U.S. 500 (1988) ................................................................................................ 31

*Carlucci v. Doe,*
   488 U.S. 93 (1988) ............................................................................................ 21, 23

*Chafin v. Chafin,*
   568 U.S. 165 (2013) ................................................................................................ 37

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) .......................................................................................... 45, 46

*City of Houston v. Dep't of Hous. & Urb. Dev.,*
   24 F.3d 1421 (D.C. Cir. 1994) ................................................................................ 38

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ............................................................................................ 36, 37, 39

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .................................................................................................... 45

*Coleman v. District of Columbia,*
    828 F. Supp. 2d 87 (D.D.C. 2011) ............................................................................ 31

*Collins v. Yellen,*
    141 S. Ct. 1761 (2021) ...................................................................................... 22, 23, 27

*Connick v. Myers,*
    461 U.S. 138 (1983) .................................................................................................... 33

*CREW v. Off. of Admin.,*
    566 F.3d 219 (D.C. Cir. 2009) .................................................................................. 17

*CREW v. Trump,*
    438 F. Supp. 3d 54 (D.D.C. 2020) ............................................................................ 15

*Dearth v. Holder,*
    641 F.3d 499 (D.C. Cir. 2011) .................................................................................. 36

*Diebold v. United States,*
    947 F.2d 787 (6th Cir. 1991) .................................................................................... 46

*Drake v. FAA,*
    291 F.3d 59 (D.C. Cir. 2002) .................................................................................... 46

*Elec. Privacy Info. Ctr. v. Drone Advisory Comm.,*
    995 F.3d 993 (D.C. Cir. 2021) .................................................................................. 47

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
    545 U.S. 546 (2005) ...................................................................................................... 9

*Farley v. United States,*
    139 F. Supp. 757 (Ct. Cl. 1956) ............................................................................... 29

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...................................................................................... 13, 14, 15, 18

*Free Enterprise Fund v. Public Co. Accounting Oversight Board,*
    561 U.S. 477 (2010) ................................................................................................ 28, 30

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) .................................................................................................... 33

*Golden v. Zwickler,*
    394 U.S. 103 (1969) .................................................................................................... 37

*Grand Lodge of Fraternal Ord. of Police v. Ashcroft,*
  185 F. Supp. 2d 9 (D.D.C. 2001) ........................................................................... 9

*Greene v. Howard Univ.,*
  271 F. Supp. 609 (D.D.C 1967) ........................................................................... 32

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ........................................................................................... 45

*Hopkins v. Price Waterhouse,*
  920 F.2d 967 (D.C. Cir. 1990) ........................................................................... 32

*Humane Soc'y of the U.S. v. Babbitt,*
  46 F.3d 93 (D.C. Cir. 1995) ....................................................................... 18, 19

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935) ........................................................................................... 26

*In re Hennen,*
  38 U.S. (13 Pet.) 230 (1839) ............................................................................. 22

*Keim v. United States,*
  177 U.S. 290 (1900) ..................................................................................... 21, 23

*Kendall v. United States ex rel. Stokes,*
  37 U.S. (12 Pet.) 524 (1838) ............................................................................. 14

*Klayman v. Jud. Watch, Inc.,*
  628 F. Supp. 2d 112 (D.D.C. 2009) ................................................................... 32

*Kowal v. MCI Commc'ns Corp.,*
  16 F.3d 1271 (D.C. Cir. 1994) ..................................................................... 31,32

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ........................................................................... 10, 13, 44

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ..................................................................... 15, 16

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) ..................................................................................... 15, 18

*Mississippi v. Johnson,*
  71 U.S. (4 Wall.) 475 (1866) ........................................................... 13, 14, 15, 18

*Morgan v. Tenn. Valley Auth.,*
  115 F.2d 990 (6th Cir. 1940) ............................................................................. 22

*Meyers v. Trinity Coll.,*
  No. CV 95 553687, 1995 WL 684815 (Conn. Super. Ct. Nov. 8, 1995) ............ 32

*Morrison v. Olson,*
487 U.S. 654 (1988) ................................................................................................ 26, 30

*Myers v. United States,*
272 U.S. 52 (1926) ................................................................................. 15, 25, 26, 34

*Nat'l Treasury Emps. Union v. Nixon,*
492 F.2d 587 (D.C. Cir. 1974) ....................................................................................... 15

*Nat'l Wildlife Fed'n v. United States,*
626 F.2d 917 (D.C. Cir. 1980) ....................................................................................... 15

*Newdow v. Bush,*
355 F. Supp. 2d 265 (D.D.C. 2005) ............................................................................. 13

*Newdow v. Roberts,*
603 F.3d 1002 (D.C. Cir. 2010) ......................................................................... 13, 18, 40

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982) ............................................................................................... 14, 15

*O'Shea v. Littleton,*
414 U.S. 488 (1974) ......................................................................................... 36, 37, 39

*Papasan v. Allain,*
478 U.S. 265 (1986) ....................................................................................................... 39

*Parsons v. United States,*
167 U.S. 324 (1897) ................................................................................................ *passim*

*People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv.* ("PETA"),
59 F. Supp. 3d 91 (D.D.C. 2014) ............................................................................. 38, 39

*PHH Corp. v. CFPB,*
881 F.3d 75 (D.C. Cir. 2018) ....................................................................................... 28

*Pievsky v. Ridge,*
98 F.3d 730 (3d Cir. 1996) ..................................................................................... 28, 29

*Raines v. Byrd,*
521 U.S. 811 (1997) ....................................................................................................... 13

*Rankin v. McPherson,*
438 U.S. 378 (1987) ....................................................................................................... 33

*Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior,*
624 F. Supp. 2d 1 (D.D.C. 2009) ................................................................................ 31

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ................................................................................................ 33, 34

*Richardson v. United States,*

526 U.S. 813 (1999) ................................................................................................................ 29

*Rizzo v. Goode,*
    423 U.S. 362 (1976) .......................................................................................................... 37

*Rosenberger v. Rector & Visitors of the Univ. of Va,*
    515 U.S. 819 (1995) .......................................................................................................... 34

*Schlesinger v. Ballard,*
    419 U.S. 498 (1975) .......................................................................................................... 31

*Sec'y of Labor v. Twentymile Coal Co.,*
    456 F.3d 151 (D.C. Cir. 2006) ........................................................................................ 46

*Seila Law LLC v. CFPB,*
    140 S. Ct. 2183 (2020) ........................................................................................... *passim*

*Severino v. Biden,*
    21-cv-0314, 2022 WL 168321 (D.D.C. Jan. 19, 2022) ........................................... *passim*

*Shurtleff v. United States,*
    189 U.S. 311 (1903) .................................................................................................. 21, 22

*Solorio v. United States,*
    483 U.S. 435 (1987) .......................................................................................................... 43

*Soucie v. David,*
    448 F.2d 1067 (D.C. Cir. 1971) ...................................................................................... 17

*Soundboard Ass'n v. Fed. Trade Comm'n,*
    888 F.3d 1261 (D.C. Cir. 2018) ...................................................................................... 40

*Spicer v. Biden, No. 21-cv-2493,*
    No. 21-cv-2493, 2021 WL 5769458 (D.D.C. Dec. 4, 2021) ..................................... *passim*

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .............................................................................................. 12, 13, 44

*Stanley v. DOJ,*
    423 F.3d 1271 (Fed. Cir. 2005) ...................................................................................... 28

*Stanley v. Gonzales,*
    476 F.3d 653 (9th Cir. 2007) .......................................................................................... 28

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ............................................................................................................ 19

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) .................................................................................. *passim*

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ........................................................................................ 44, 45


*Transwestern Pipeline Co. v. Fed. Energy Regul. Comm'n,*
   897 F.2d 570 (D.C. Cir. 1990) .......................................................................... 37, 38

*Umbert v. United States,*
   No. 18-cv-1336, 2019 WL 4305576 (D.D.C. Sept. 11, 2019) .............................. 39

*United States ex rel. Frizzell v. Newman,*
   42 App. D.C. 78 (D.C. Cir. 1914) ........................................................................... 28

*Uzuegbunam v. Preczewski,*
   141 S. Ct. 792 (2021) .............................................................................................. 13

*Weinstein v. Bradford,*
   423 U.S. 147 (1975) ................................................................................................. 39

## Constitutional Provisions

U.S. Const., art. I, § 8, cl. 14 ......................................................................... 43, 47

U.S. Const., art. III, § 2 .......................................................................... 13, 14, 30

## Statutes

3 U.S.C. § 105 ...................................................................................................... 17

5 U.S.C. App. 2 § 2 .............................................................................................. 41

5 U.S.C. App. 2 § 3 ....................................................................................... 42, 47

5 U.S.C. App. 2 § 4 .............................................................................................. 42

5 U.S.C. App. 2 § 8 ....................................................................................... 46, 47

5 U.S.C. App. 2 § 9 .............................................................................................. 41

5 U.S.C. App. 2 § 10 ............................................................................................ 42

5 U.S.C. App ......................................................................................................... 5

5 U.S.C. § 551 ...................................................................................................... 17

5 U.S.C. § 701 ...................................................................................................... 45

10 U.S.C. § 4 .......................................................................................................... 4

10 U.S.C. § 5 .......................................................................................................... 4

10 U.S.C. § 7211 .................................................................................................. 28

10 U.S.C. § 7217 .................................................................................................. 28

10 U.S.C. § 7455 .................................................................................................... 5

10 U.S.C. § 8468 .................................................................................................... 5

10 U.S.C. § 9455 ........................................................................................................ *passim*

12 U.S.C. § 4512 .................................................................................................................. 27

12 U.S.C. § 5491 .................................................................................................................. 28

Act of Congress of July 12, 1876, 19 Stat. 80, 81, ch. 179 ................................................ 25

## Rules

Federal Rules of Civil Procedure 12 .......................................................................... *passim*

## Regulations

41 C.F.R. § 102-3.50 ................................................................................................ 5, 46, 47

## Other Authorities

1 Annals of Cong. 463 (1789) .............................................................................................. 15

Adrian Vermeule, *Conventions of Agency Independence, Conventions of Agency Independence,*
    113 Colum. L. Rev. 1163 (2013) ................................................................................. 26

Bradley H. Patterson, The White House Office of Presidential Personnel,
    2001 Pres. Stud. Q. 415 (2001) ................................................................................. 8, 16

Chris Cameron, NEW YORK TIMES, White House Forces Out Trump Appointees From Boards of
    Military Academies (Sept. 8, 2021), https://www.nytimes.com/2021/09/08/
    us/politics/trump-appointees-military-academy-boards.html .......................................... 34

Cynthia R. Farina, *False Comfort and Impossible Promises: Uncertainty, Information Overload, and the Unitary
    Executive, False Comfort and Impossible Promises: Uncertainty, Information Overload, and the Unitary
    Executive,* 12 U. Pa. J. Const. L. 357 (2010) ................................................................. 17

Douglas S. Onley, *Treading on Sacred Ground: Congress's Power to Subject White House Advisers to Senate
    Confirmation,* 37 Wm. & Mary L. Rev. 1183 (1996) .............................................. 16, 17

James P. Pfiffner, *Recruiting Executive Branch Leaders: The Office of Presidential Personnel,* Brookings
    Institute (Mar. 1, 2001), https://www.brookings.edu/articles/recruiting-executive-branch-
    leaders-the-office-of-presidential-personnel/ ..................................................................... 8

Katelyn Caralle & Rob Crilly, DAILYMAIL.COM (Sept. 9, 2021),
    https://www.dailymail.co.uk/news/article-9973659/Jen-Psaki-insists-Joe-Biden-right-kick-
    Trump-picks-militaryacademy-advisory-boards.html ......................................................... 34

Kirti Datla & Richard Revesz, *Deconstructing Independent Agencies (and Executive Agencies),*
    98 Cornell L. Rev. 769 (2013) ........................................................................... 27, 34, 35

Lauren C. Bell, *Federal Judicial Selection in History and Scholarship,*

96 Judicature 296 (2013) ............................................................................................... 8, 16

Marshall Breger & Gary Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111 (2000) .......................................................................... 27

Michael A. Livermore, Political Parties and Presidential Oversight, *Political Parties and Presidential Oversight*, 67 Ala. L. Rev. 45 (2015) .................................................................................. 8, 9

*Restatement (Second) of Contracts* § 367 cmt.(1981) ............................................................. 32

S. Doc. No. 79-248 (1946)............................................................................................. 46

Senate Committee on Homeland Security and Governmental Affairs, United States Government Policy and Supporting Positions at 2 (2016) ("Plum Book"), https://www.govinfo.gov/content/pkg/GPO-PLUMBOOK-2016/pdf/GPO-PLUMBOOK-2016.pdf............................................................................................... 8 ,9 ,17

USAFA, About, https://www.usafa.edu/about/bov/ .......................................................... 38

USMA, Upcoming Meetings, https://www.westpoint.edu/about/superintendent/board-of-visitors/upcoming-meetings......................................................................................... 38

USNA, Office of the Superintendent, Board of Visitors, https://www.usna.edu/PAO/Superintendent/bov.php ........................................................ 38

## INTRODUCTION

Plaintiffs in this action—four private citizens and two sitting members of the United States House of Representatives—assert several different challenges to decisions made by the President and the Secretary of Defense regarding the Boards of Visitors of the United States Air Force, Navy, and Military Academies. Each of those challenges, spread across four overlapping Counts in Plaintiffs' Fourth Amended Complaint, fails on both jurisdictional and merits grounds. The Court should thus dismiss the Complaint for lack of jurisdiction and for failure to state a claim on which relief can be granted under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

The bulk of Plaintiffs' claims—embodied in Count One and parts of Counts Two, Three, and Four—constitute various challenges to the President's authority to remove individuals he appointed to the Board of Visitors to the Air Force Academy. Then-President Donald J. Trump appointed Plaintiffs Heidi Stirrup, Douglas Lengenfelder, and Robert Gleason to this Board at various points throughout 2020. On September 8, 2021, President Joseph R. Biden requested that they resign from those positions, and after each refused, he removed them from the Board. Those three individuals now challenge their removals, seeking a mandatory injunction compelling their reappointments to the Board.

That is an extraordinary request, and Stirrup, Lengenfelder, and Gleason fail to allege any basis for it. Jurisdictionally, they lack standing to seek reappointment because their supposed injuries are not redressable under longstanding separation-of-powers principles that bar federal courts from directly enjoining or issuing declaratory relief against the President. While they also sue one of the President's assistants, Director of the Presidential Personnel Office Catherine M. Russell, and the Air Force Academy Board's Designated Federal Officer Anthony McDonald, that does not fix their redressability flaws. No relief against them can remedy the alleged harm.

Were the Court to reach the merits on these claims, they would fail there too: The President was well within his statutory and constitutional authority in removing Plaintiffs from the Board. The statute establishing the Board permits the President alone, without Senate confirmation, to select six

of its overall fifteen members for three-year terms.  At the same time, nothing in the statute restricts the President's ability to remove those members he appoints.  The Supreme Court has long held that statutes seeking to limit the removal authority of an appointing official must expressly state such a limitation.  The lack of any such language here defeats Stirrup, Lengenfelder, and Gleason's claims on the merits.

Turning from their removal claims, Plaintiffs Stirrup, Lengenfelder, and Gleason also join the remaining three Plaintiffs—Sean Spicer, a former member of the Board of Visitors to the Naval Academy, Congressman Mark Green, a member of the Board of Visitors to the U.S. Military Academy, and Congressman Ralph Norman—to challenge Secretary of Defense Lloyd Austin's decision to temporarily pause each Board's operations during an agency-wide review of its advisory committees in Counts Two and Four.  Stirrup, Lengenfelder, Gleason, and Green also challenge this action as "viewpoint discrimination" in violation of the First Amendment in Count Three.  Each of these "board suspension" claims fails for both jurisdictional and merits reasons.  The Secretary's review has ended and Board activity has resumed.  As a jurisdictional matter, Plaintiffs cannot seek injunctive relief based only on a past injury, and regardless, their claims relating to this now-concluded suspension are moot. And on the merits, the Secretary's temporary suspension of Board activities was lawful because the statute governing advisory committees gives the Boards' Designated Federal Officers the authority to call and adjourn any Board meetings, just as they did here.

Finally, Plaintiffs challenge the Secretary's decision to permit the Boards to establish subcommittees—all six Plaintiffs in Counts Two and Four, and Stirrup, Lengenfelder, Gleason, and Green in Count Three.  These claims, too, fail on both jurisdictional and merits grounds.  Plaintiffs cannot show standing to challenge the decision on subcommittees, as they fail to allege how that decision causes them any injury whatsoever.  Further, the Secretary made his decision to authorize the creation of subcommittees under a statutory provision that contains no discernable standards, so that decision is committed to his discretion and thus not subject to judicial review.  And even if it were, Plaintiffs' claims would fail on their merits: Under the Federal Advisory Committee Act, the Secretary possesses the statutory authority to set internal administrative guidelines for the Boards, and acted

lawfully in doing so here.

Because this Court has no jurisdiction to hear any of Plaintiffs' claims, and because Plaintiffs have otherwise failed to plead sufficient facts to state a claim upon which relief can be granted, this Court should dismiss the Fourth Amended Complaint under Rules 12(b)(1) and 12(b)(6).

## BACKGROUND

### I.    The Board of Visitors to the Air Force Academy

Congress created a Board of Visitors to the Air Force Academy ("Air Force Academy Board") to annually "inquire into the morale, discipline, and social climate, the curriculum, instruction, physical equipment, fiscal affairs, academic methods, and other matters" at the United States Air Force Academy in Colorado Springs, Colorado. 10 U.S.C. § 9455(a), (e). To fulfill this mandate, the Air Force Academy Board is required to visit the Air Force Academy annually, though it may make additional visits to the Academy with the approval of the Secretary of the Air Force. *Id.* § 9455(d). The Board provides "a semiannual report containing its views and recommendations pertaining to the Academy" to the Secretary of Defense and to the Senate and House Committees on Armed Services. *Id.* § 9455(f).

The fifteen-member Board includes: (1) the chairman of the Senate Armed Services Committee; (2) three other members of the Senate designated by the Vice President or the President pro tempore of the Senate, two of whom must be members of the Appropriations Committee; (3) the chairman of the House Armed Services Committee; and (4) four other members designated by the Speaker of the House, three of whom must be members of the House Appropriations Committee and a fourth who may not be a member of the House of Representatives. *Id.* § 9455(a)(2)-(5).[1]

The remaining members of the Board are the "six persons designated by the President." *Id.* § 9455(a)(1). Section 9455 grants the President complete discretion in selecting these individuals—it does not condition their service on Senate confirmation, nor does it require that they hold certain Congressional offices, as with the other members of the Board. *See generally id.* § 9455(a). The six

---

[1] The Chairmen of the Senate and House Armed Services Committees may, alternatively, select a designee to take their place on the Board. *See* 10 U.S.C. § 9455(a)(1), (3).

persons designated by the President serve default three-year terms. *Id.* § 9455(b)(1). If a Presidentially appointed member of the Board cannot complete the appointed term, "a successor shall be designated for the unexpired portion of the term by the official who designated the member." *Id.* § 9455(c)(1). This staggering of Presidential-appointee terms means that the President is empowered to "designate persons each year to succeed the members . . . whose terms expire that year." *Id.* § 9455(b)(1). A Presidentially appointed member whose term of office has expired may continue to "serve until his successor is designated." *Id.*

A Charter further spells out the Board's function and duties. *See generally* McMahon Decl., Ex. A ("Air Force Academy Board Charter").[2] The Air Force Academy Board Charter explains that the Board "shall report to the Secretary of Defense and Deputy Secretary of Defense, through the Secretary of the Air Force, and to the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives." *Id.* § 5. Specifically, the Board provides "independent advice and recommendations" on the state of the Air Force Academy. *Id.* § 4; *see also* 10 U.S.C. § 9455(e). Board members are not compensated for their service, excepting reimbursement of official Board-related travel and per diem. *See* Air Force Academy Board Charter § 12. The Charter also provides for a Designated Federal Officer ("DFO") who is "required to be in attendance at all meetings of the Board and any of its subcommittees." *Id.* § 8. The DFO "shall call all of the meetings of the Board and its subcommittees; prepare and approve all meeting agendas; and adjourn any meeting when the DFO . . . determines adjournment to be in the public interest as required by governing regulation or DoD [("Department of Defense")] policy and procedures." *Id.*[3] The DFO must be a "full-time or permanent part-time DoD employee." *Id.* The current Air Force Academy Board DFO is Anthony "Ryan" McDonald. *See* Fourth Am. Compl. ¶ 51, ECF No. 37.

---

[2] Even though Plaintiffs repeatedly cite to the Boards' Charters and Bylaws in the Complaint, it does not appear to include a copy. Accordingly, Defendants have attached them as exhibits.

[3] In the absence of the DFO, "a properly approved Alternate DFO, duly designated to the Board according to established DoD policies and procedures," may instead attend the Board's meetings. Air Force Academy Board Charter § 8.

In addition to the Charter, the Air Force Academy Board's Bylaws further detail its operations. *See* McMahon Decl., Ex. B ("Air Force Academy Board Bylaws"). It permits the Secretary of the Air Force the ability to, "when necessary and consistent with the Board's mission and DoD policies and procedures, create subcommittees of the parent committee (the Board)." *Id.* § 5.

## II.   The Board of Visitors to the Naval Academy and the Military Academy

Congress also created similar Boards of Visitors to the U.S. Naval Academy ("Naval Academy Board") and the U.S. Military Academy ("USMA Board"). *See generally* 10 U.S.C. § 8468; *id.* § 7455. These boards are also comprised of fifteen members, including six designated by the President. *Id.* § 8468(a); *id.* § 7455(a). They are instructed to "inquire into the state of morale and discipline, the curriculum, instruction, physical equipment, fiscal affairs, academic methods, and other matters" at their respective military academies. *Id.* § 8468(e); *id.* § 7455(e).

Both Boards are required to visit the academies annually and they may make additional visits with the approval of the Secretary of the Army and the Secretary of the Navy. *Id.* § 8468(d); *id.* § 7455(d). They both report their findings annually to the President, providing "written report[s] of [the Boards'] action and of [their] views and recommendations" within 60 days of the visits. *Id.* § 8468(f); *id.* § 7455(f). Those Boards also each have a Designated Federal Officer who "approves and calls all Board meetings; prepares and approves all meeting agendas; and adjourns any meeting when the DFO or ADFO determines adjournment to be in the public interest or required by governing regulations or DoD policy and procedures." McMahon Decl., Ex. C ("Naval Academy Board Charter"); McMahon Decl., Ex. D ("USMA Board Charter").

## III.   The Board of Visitors' Zero-Based Review

The Secretary of Defense authorized the Boards pursuant to the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. *See* 41 C.F.R. § 102-3.50(a); *see also* Air Force Academy Board Charter § 2; USMA Board Charter § 2; Naval Academy Board Charter § 2. On January 30, 2021, Defense Secretary Lloyd Austin issued a memo explaining that he was conducting a "zero-based review" of all Department of Defense advisory committees to "ensure each advisory committee provides appropriate value today and in the future." Fourth Am. Compl., Ex. 6 at 4-5. He directed Department

of Defense personnel to "conduct an in-depth business case of every sponsored advisory committee, supported by fact-based evidence for continued utilization of the advisory committee." *Id.* at 5. That included considering "the committee's mission and function as it relates to DoD strategic priorities and National Defense Strategy; potential functional realignments to create a single cross-functional advisory committee; and potential legislative changes to non-discretionary advisory committees to properly align them with our strategic priorities." *Id.* Then, a different Department of Defense official would "review each . . . business case and make final recommendations to [him] on each DoD advisory committee, to include retention, realignment, termination, changes to mission or functions, membership balance, membership size, and possible legislative changes to non-discretionary advisory committees." *Id.* Only then would the Secretary "take action on the . . . recommendations." *Id.* Secretary Austin also called for "immediate suspension of all advisory committee operations until the review is completed." *Id.* at 4. Because the zero-based review encompassed "every sponsored advisory committee," it applied to the Air Force Academy Board, the U.S. Military Academy Board, and the Naval Academy Board. *Id.* at 5, 6-12.

On February 4, 2021, DFO McDonald informed the Air Force Academy Board that Secretary Austin had suspended the operations of all Department of Defense advisory committees "pending completion of a Zero-Based Review[.]" Fourth Am. Compl., ¶ 53; *id.* Ex. 5. He explained that the Air Force Academy Board would "remain in place and . . . board membership will not be impacted," but that it would not "hold any meetings . . . or otherwise undertake official board business that would drive expenditure of public funds until the Secretary of Defense has reviewed our business case analysis and lifted suspension of our advisory committee." *Id.* Finally, he noted that the Air Force Academy Board's April 8, 2021 meeting would be rescheduled. *Id.*

On September 17, 2021, Secretary Austin wrote to the Secretaries of the Air Force, Army and Navy informing them that "[b]ased on the recommendations of the Zero-Based Review Board . . . [he] authorize[d] the Board of Visitors . . . to immediately resume operations." Fourth Am. Compl, Ex. 1. Secretary Austin also explained that while the Department of Defense "previously determined that subcommittees are not authorized" for the Boards, following the review, he delegated the

authority to establish the subcommittees "if [they] determine such action is essential to" Board operations. *Id.* He noted that because "parent and subcommittee member appointments are separate and distinct," the authority to appoint subcommittee members "rests solely with the Secretary of Defense or the Deputy Secretary of Defense." *Id.*

## IV.    The Appointment and Removal of Plaintiffs Stirrup, Lengenfelder, and Gleason From the Board

Three Plaintiffs in this action—Heidi Stirrup, Douglas Lengenfelder, and Robert Gleason—are former members of the Air Force Academy Board. Fourth Am. Compl. ¶¶ 14-16. President Trump appointed Lengenfelder on June 28, 2020 and Stirrup on December 17, 2020. *Id.* ¶¶ 14-15. Stirrup and Lengenfelder's terms would have expired on December 31, 2021. *See id.*; 10 U.S.C. § 9455(c)(1) ("If a member of the Board dies or resigns or is terminated as a member of the Board . . ., a successor shall be designated for the unexpired portion of the term by the official who designated the member."). President Trump first appointed Gleason on July 27, 2018, and reappointed him on December 17, 2020. Fourth Am. Compl. ¶ 16. His term was set to run through the end of 2023. 10 U.S.C. § 9455(b)(1). Consistent with the Air Force Academy Board's statute, no Plaintiff's appointment required Senate confirmation.

On September 8, 2021, Stirrup, Lengenfelder, and Gleason received substantially similar emails from Katherine L. Petrelius, Special Assistant to the President in the White House Presidential Personnel Office. Fourth Am. Compl. ¶ 61. The emails requested that they each resign from the Board, explaining that refusal to resign would result in termination the same day. *Id.* The emails also attached letters from Catherine M. Russell, the Director of the White House of Presidential Personnel Office, stating:

> On behalf of President Biden, I am writing to request your resignation as a Member of the Board of Visitors to the U.S. Air Force Academy. Please submit your resignation to me by the close of business today. Should we not receive your resignation, your position with the Board will be terminated effective 6:00 p.m. tonight. Thank you.

*Id.* ¶ 62; *see id.* Ex. 10.  Stirrup, Lengenfelder, and Gleason refused to resign and accordingly, their membership on the Board was terminated effective at 6:00 p.m. on September 8, 2021, per President Biden's order.  *Id.* ¶¶ 61-62; *see id.* Ex. 10.

## V.  The White House Presidential Personnel Office

The White House Presidential Personnel Office ("PPO") advises and assists the President in filling vacancies in leadership positions throughout the federal government.  *See* Lauren C. Bell, *Federal Judicial Selection in History and Scholarship*, 96 Judicature 296, 299 (2013); *see generally* Bradley H. Patterson, The White House Office of Presidential Personnel, 2001 Pres. Stud. Q. 415 (2001).  The PPO is reconstituted with every new presidential administration and is tasked with identifying non-career Executive Branch leaders.  *See* James P. Pfiffner, *Recruiting Executive Branch Leaders: The Office of Presidential Personnel*, Brookings Institute (Mar. 1, 2001), https://www.brookings.edu/articles/recruiting-executive-branch-leaders-the-office-of-presidential-personnel/.[4]  The PPO recruits for "the most important [positions] in the executive branch," including "the cabinet and subcabinet, leaders of independent agencies, and regulatory commissioners," along with ambassadors.  *Id.*; *see also* Patterson, 2001 Pres. Stud. Q. at 416-17 (listing noncareer positions subject to political appointment).  As a result, PPO leadership is typically identified prior to a president's inauguration so that potential nominees can be prepared during the presidential transition period.  *See* Patterson, 2001 Pres. Stud. Q. at 423 (explaining the need to constitute the OPP immediately following the election); *see also* Pfiffner, *Recruiting Executive Branch Leaders* ("The personnel office must be ready to go the day after the election" as "advanced planning is crucial").

The PPO is located directly within the White House Office, which itself is part of the larger Executive Office of the President.  *See* Michael A. Livermore, Political Parties and Presidential Oversight, 67 Ala. L. Rev. 45, 55 n.43 (2015); *accord* Senate Committee on Homeland Security and Governmental Affairs, United States Government Policy and Supporting Positions at 2 (2016) ("Plum

---

[4] By comparison, the Office of Personnel Management is a permanently existing agency responsible for recruiting and promoting individuals within the career civil service.  Pfiffner, *Recruiting Executive Branch Leaders*.

Book"), *available at* https://www.govinfo.gov/content/pkg/GPO-PLUMBOOK-2016/pdf/GPO-PLUMBOOK-2016.pdf. The White House Office and Executive Office of the President have "traditionally been home to many of the President's closest advisors." *See* The Executive Branch, White House, *available at* https://www.whitehouse.gov/about-the-whitehouse/our-government/the-executive-branch/. These advisors typically "are appointed with full Presidential discretion." *Id.*

Catherine M. Russell, the Director of the PPO, is no exception. Russell is a presidential appointee not subject to Senate confirmation who has the title of Assistant to the President. *See* Plum Book at 2.

## VI.   Present Litigation

Plaintiffs first filed suit on July 15, 2021, arguing that the Air Force Academy Board's suspension of operations violated the Administrative Procedure Act ("APA") and various Constitutional provisions. *See generally* ECF No. 1. Plaintiffs have since amended their complaint four times, most recently filing their Fourth Amended Complaint on April 7, 2022. *See* Fourth Am. Compl. Like its most recent predecessor, the Fourth Amended Complaint focuses on three actions: (1) the President's removal of Stirrup, Lengenfelder, and Gleason from the Air Force Academy Board; (2) the temporary suspension of operations of the Air Force Academy Board, U.S. Military Academy Board, and Naval Academy Board; and (3) the Secretary's decision to permit the Boards to create subcommittees at their discretion. *See generally id.*

## LEGAL STANDARD

Defendants move to dismiss the complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). A federal court is presumed to lack jurisdiction until jurisdiction is established in a case. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 551 (2005). The Court must ensure itself of jurisdiction before proceeding. *See Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) ("[A] Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional

authority.").   The party invoking the court's jurisdiction bears the burden of demonstrating that jurisdiction exists at all times throughout the case.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Defendants also move to dismiss the complaint for failure to state a claim under Rule 12(b)(6). When considering such a motion, the Court must accept as true all well-pleaded facts and allegations in the complaint, but does not need to accept a plaintiff's legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 679 (citing *Twombly*, 550 U.S. at 556).

## ARGUMENT[5]

Across four separate but overlapping Counts in their Complaint, Plaintiffs appear to challenge three distinct alleged actions under multiple theories.[6]  First, in Counts One, Two, Three and Four, Plaintiffs Stirrup, Lengenfelder, and Gleason challenge their removals from the Air Force Academy Board.  They contend their removals constitute a breach of contract (Count One), Fourth Am. Compl. ¶¶ 132-35, that it violated the APA (Count Two), *id.* ¶ 138, that it was impermissible "viewpoint

---

[5] This brief in large part substantively resembles Defendants' Motion to Dismiss the Third Amended Complaint, ECF No. 29, because many of Plaintiffs' allegations have not materially changed in the Fourth Amended Complaint.

[6] The Complaint is not clear on which Plaintiffs are asserting which claims.  It appears that the only Plaintiffs challenging their removal from Board positions are Stirrup, Lengenfelder, and Gleason, so Defendants proceed as though only those three Plaintiffs bring Counts One and the removal claims contained in Counts Two, Three and Four.  Defendants also proceed as though Stirrup, Lengenfelder, Gleason and Green are bringing the claims concerning the Board suspensions and the decision to authorize subcommittees in Count Three.  In Counts Two and Four, Plaintiffs do not specify which Plaintiffs assert the suspension and subcommittee issues contained in those counts.  Plaintiffs assert that Spicer "is a plaintiff in this lawsuit solely to seek a declaratory judgment and an injunction regarding the suspension of the BOVs."  Fourth Am. Compl. ¶ 33.  Spicer and another plaintiff filed a separate action concerning his removal, and the court in that case denied Plaintiffs' motion for a preliminary injunction, holding that they were unlikely to succeed on the merits, *see Spicer v. Biden*, No. 21-cv-2493, 2021 WL 5769458 (D.D.C. Dec. 4, 2021).  Accordingly, Defendants proceed as though all Plaintiffs bring the claims contained in Counts Two and Four challenging the Board suspensions, and all Plaintiffs but Spicer bring the claims in Counts Two and Four challenging the subcommittee authorization.

discrimination" (Count Three), *id.* ¶ 142, and that it violated the U.S. Constitution (Count Four), *id.* ¶ 149.

Second, in Counts Two, Three, and Four, Plaintiffs challenge the temporary suspension of the Boards during the Secretary's zero-based review of the Department of Defense advisory committees. In Count Two, all six Plaintiffs contend that this action violated the APA, *id.* ¶ 138; in Count Three, Plaintiffs Stirrup, Lengenfelder, Gleason, and Green contend that it constituted impermissible "viewpoint discrimination" under the First Amendment, *id.* ¶ 142; and in Count Four, all six Plaintiffs contend that it violated other provisions of the U.S. Constitution, *id.* ¶ 149.

Third, in Counts Two, Three, and Four, Plaintiffs challenge the Secretary's decision to authorize the Boards to create subcommittees. In Counts Two and Four, five Plaintiffs—Stirrup, Lengenfelder, Gleason, Green, and Norman—contend that his decision violates the APA (Count Two), *id.* ¶ 138, and the U.S. Constitution (Count Four), *id.* ¶ 149. And in Count Three, Plaintiffs Stirrup, Lengenfelder, Gleason, and Green contend that it violates the First Amendment. *Id.* ¶ 142. Each of these claims fails.

Count One, and the removal claims asserted in Counts Two, Three, and Four, fail both for lack of jurisdiction and on their merits. Plaintiffs Stirrup, Lengenfelder, and Gleason have no standing to challenge their removals because courts cannot enjoin the President or those carrying out his orders, so their harms are not redressable. Accordingly, this Court should dismiss Count One as well as the removal claims in Counts Two, Three, and Four for lack of jurisdiction under Rule 12(b)(1). Even if the Court did have jurisdiction, their claims would fail on the merits because the President has the power to remove members of the Air Force Academy Board at his discretion, so his actions were valid. Moreover, Stirrup, Lengenfelder, and Gleason have plainly failed to state a claim for breach of contract or under the First Amendment, so Count One and Count Three would fail anyway. This Court should also dismiss Count One, and the removal claims in Count Two, Three, and Four, under

Rule 12(b)(6).

Likewise, the Board suspension claims asserted in Counts Two, Three, and Four fail both for lack of jurisdiction and on their merits. The Court lacks jurisdiction over Plaintiffs' challenges to the temporary suspension of the Boards under the APA and the Constitution for three reasons. First, Plaintiffs have no standing to bring these claims. Second, even if Plaintiffs might have shown standing at one time, the Boards have resumed meeting, thus rendering their claims moot. Finally, the Court has no jurisdiction over Plaintiffs' APA challenge because the zero-based review and temporary suspension are not final agency actions. And on the merits, if the Court were to find jurisdiction, Plaintiffs' claims as to the Board suspension would fail because the DFO had statutory authorization to adjourn meetings while the review took place. This Court should dismiss Counts Two, Three, and Four as to Plaintiffs' "board suspension" claims under Rule 12(b)(1) or Rule 12(b)(6).

Finally, the claims asserted in Counts Two, Three, and Four challenging the Secretary's decision to authorize the Boards to create subcommittees similarly fail both for lack of jurisdiction and on their merits. Plaintiffs again have no standing to challenge the Secretary's authorization of subcommittees. That decision is also committed to the discretion of the Secretary and is unreviewable by this Court. Moreover, even if the Court had jurisdiction as to these claims, the Secretary acted well within his statutory authority in permitting the Boards to enact subcommittees. This Court should thus also dismiss Counts Two, Three, and Four as to Plaintiffs' challenges to the subcommittee decision under Rule 12(b)(1) or Rule 12(b)(6).

## I. Plaintiffs' Claims Challenging the Removal of Stirrup, Lengenfelder, and Gleason From the Air Force Academy Board Should Be Dismissed

### A. Plaintiffs have no standing to challenge the removal of Plaintiffs Stirrup, Lengenfelder, and Gleason because their harms are not redressable.

"The Constitution confers limited authority on each branch of the Federal Government." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). The judicial power "extends only to 'Cases' and

'Controversies,'" and "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Id.* (quoting U.S. Const., art. III, § 2; *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). To establish the existence of a "Case" or "Controversy," a plaintiff must meet the "irreducible constitutional minimum" for standing, which requires showing that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 338 (citing *Lujan*, 504 U.S. at 560-61). Accordingly, "no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021).

### 1. *Federal courts lack jurisdiction to subject the President to injunctive or declaratory relief.*

The Complaint asks this Court to "[d]irect that Plaintiffs Stirrup, Lengenfelder, and Gleason be immediately reinstated to their positions on the USAFA BOV for the entirety of their terms." Fourth Am. Compl. Prayer for Relief. But "[w]ith regard to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted). A deep and longstanding pedigree supports this rule. *See Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'") (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)); *Swan v. Clinton*, 100 F.3d 973, 976 n.1, 978 (D.C. Cir. 1996) (holding courts lack the authority to enjoin the President in the performance of his official duties and that "similar considerations" restrict a court's power to issue a declaratory judgment against the President); *Newdow v. Bush*, 355 F. Supp. 2d 265, 280 (D.D.C. 2005) ("There is a longstanding legal authority that the judiciary lacks the power to issue an injunction or declaratory judgment against the co-equal branches of the government—the President and the Congress." (collecting cases)). As Justice Scalia explained, concurring in *Franklin*, an "apparently unbroken historical tradition supports the view, . . . implicit in the separation of powers established by the Constitution, that the principals in whom the executive and legislative powers are ultimately vested—*viz.*, the President and the Congress

(as opposed to their agents)—may not be ordered to perform particular executive or legislative acts at the behest of the Judiciary." 505 U.S. at 827 (Scalia, J., concurring). "For similar reasons," Justice Scalia concluded that courts "cannot issue a declaratory judgment against the President." *Id.*

The reasons for this rule are "painfully obvious." *Swan*, 100 F.3d at 978. The President and the judiciary are co-equal branches of government, and the latter ordering the former to perform specific executive acts "at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Id.* (citing *Franklin*, 505 U.S. at 827 (Scalia, J., concurring)); *accord Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 610 (1838) ("The executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power."). The Supreme Court considered the "possible consequences" of the judiciary enjoining the President in *Mississippi*, cautioning that it could potentially create a conflict between the President obeying the Court's injunction and executing an act of Congress. *See* 71 U.S. (4 Wall.) at 500-01. And the Court further warned of its lack of "power to enforce its process" in support of any injunction against the President. *Id.* at 501. For those reasons, the Court concluded that an "attempt on the part of the judicial department . . . to enforce the performance of [executive and political] duties by the President [is] 'an absurd and excessive extravagance.'" *Id.* at 499 (quoting Marshall, C.J.).

Granting Stirrup, Lengenfelder, and Gleason their requested relief would require this Court to commandeer one of the most essential and discretionary Executive functions in the Constitution— the President's power to appoint and remove other Executive Branch officials. *See* U.S. Const., art. II, § 2, cl. 2 (granting the President the power to nominate principal officers of the United States and further granting, inter alia, "the President alone" the power to appoint inferior officers under laws made by Congress). "The President occupies a unique position in the constitutional scheme," and Article II "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Nixon v.*

*Fitzgerald*, 457 U.S. 731, 749-50 (1982).  Chief among these discretionary and sensitive responsibilities is "management of the Executive Branch—a task for which 'imperative reasons requir[e] an unrestricted power [in the President] to remove the most important of his subordinates in their most important duties.'"  *Id.* at 750 (quoting *Myers v. United States*, 272 U.S. 52, 134-35 (1926));  *accord  Seila Law  LLC  v.  CFPB*,  140  S.  Ct.  2183,  2197  (2020) ("[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." (quoting Madison, 1 Annals of Cong. 463 (1789)); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 167 (1803) ("The power of nominating to the senate, and the power of appointing the person nominated, are political powers, to be exercised by the President according to his own discretion.").   By constitutional  design,  courts  lack  the  authority  to  "control,  direct,  or  restrain"  the  President's discretionary exercise of this core executive power.  *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *see also Franklin*, 505 U.S. at 802-03; *Mississippi*, 71 U.S. (4 Wall.) at 501.[7]  Accordingly, under these longstanding separation-of-powers principles, courts lack the ability to enjoin or issue declaratory relief against the President.  *See Citizens for Resp. & Ethics in Wash. ("CREW") v. Trump*, 438 F. Supp. 3d 54, 69 n.14 (D.D.C. 2020) (dismissing case under Rule 12(b)(1) where claims were "not redressable"

---

[7] The Supreme Court's decision in *Franklin* "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty."  *Swan*, 100 F.3d at 977 (citation omitted).  "A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty."  *Id.* (citing *Mississippi*, 71 U.S. at 498).  But a President's appointment and removal power is a responsibility of the "utmost discretion," *Nixon*, 457 U.S. at 750, and is "to be exercised by the President according to his own discretion" under the Constitution, *Marbury*, 5 U.S. (1 Cranch) at 167.  And even if this case involved a ministerial duty, courts still routinely decline to compel the President to perform such ministerial duties due to the separation-of-powers problems raised by such relief.  *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (declining to issue writ of mandamus compelling President to perform ministerial duty); *Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 926 (D.C. Cir. 1980) (similar).

because the "court lack[ed] the power to award injunctive relief and compel the President to perform discretionary duties").

> ### 2. Injunctive or declaratory relief against Defendants Russell or McDonald cannot redress any alleged injuries attributable to Plaintiffs' removal.

Stirrup, Lengenfelder, and Gleason also assert the same claims against Defendant Russell, the Director of the PPO, and Defendant McDonald, the DFO of the Air Force Board of Visitors. The Court similarly lacks jurisdiction to issue injunctive or declaratory relief against either Russell or McDonald.

As Director of the PPO, Russell has no independent authority or duties with respect to the Boards. The Air Force Board statute grants the President alone the power to appoint (and thus also to remove) six appointees to the board. *See* 10 U.S.C. § 9455(a)(1). As an assistant to the President in the PPO, Russell may "receive[] recommendations, check[] references, conduct[] thorough background investigations of potential nominees, and, ultimately, make[] a recommendation to the president." Bell, 96 Judicature at 299. But it is "[t]he president [that] then makes a nomination and submits it to the Senate," if such confirmation is necessary for the office, and otherwise directly appoints individuals to offices that do not require Senate confirmation. *Id.*; *see also* Patterson, 2001 Pres. Stud. Q. at 420 (explaining "the OPP has responsibility for *recommending* nominations" (emphasis added)). Presidential assistants thus can advise the President about appointments to the Boards, or (as here) convey the President's orders to members of the Board, but the duty to act is the President's alone. *See Marbury*, 5 U.S. (1 Cranch) at 165-66 (explaining that the President "is authorized to appoint certain officers, who act by his authority and in conformity with his orders" to "aid him in the performance of these duties," and that when "act[ing] by his authority and in conformity with his orders . . . their acts are his acts").

Further still, Russell's role as Assistant to the President is structurally advisory to the President. Her position is located within the White House Office, comprised of "[c]ore presidential advisors and assistants," within the larger Executive Office of the President. Douglas S. Onley, *Treading on Sacred Ground: Congress's Power to Subject White House Advisers to Senate Confirmation*, 37 Wm. & Mary L. Rev.

1183, 1187 n.24 & 1212 (1996) (further observing that assistants' positions within the White House Office are not statutorily created and that assistants serve at the pleasure of the President); *see also* Cynthia R. Farina, *False Comfort and Impossible Promises: Uncertainty, Information Overload, and the Unitary Executive*, 12 U. Pa. J. Const. L. 357, 406 (2010) (describing White House Office as "the core of the current presidential support structure"); Plum Book at 2-3 (placing the White House Office within the Executive Office of the President). While Congress allocates funding for these positions, it recognizes the President's plenary authority to appoint "employees in the White House Office without regard to any other provision of law" and instructs only that advisors "shall perform such official duties as the President may prescribe." 3 U.S.C. § 105(a). Russell therefore serves at the President's pleasure with no Congressional check on her appointment, tenure, or duties. She is a member of "White House staff, which solely advise[] and assist[] the President" and are not "like an agency to which substantial independent authority has been delegated." *Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 558, 565 (D.C. Cir. 1996) (further concluding National Security Council has no "substantive role apart from that of the President, as opposed to a coordinating role on behalf of the President"); *cf. Off. of Admin.*, 566 F.3d 219, 224 (D.C. Cir. 2009) (finding EOP component not to be an "agency" under FOIA because it wielded no authority independent from the President and was not "authorized to perform tasks other than operational and administrative support for the President and his staff").[8]

Courts decline to issue injunctive or declaratory relief against individuals exercising power that are purely an extension of the President's own discretionary authority. For example, in *Al-Aulaqi v. Obama*, the court observed that the "Supreme Court has repeatedly acknowledged the separation-of-powers concerns posed by any judicial attempt to 'enjoin the President in performance of his official

---

[8] For this reason, the APA's § 704 also supplies no jurisdiction over the claims against Russell. The APA defines an "agency" as "each authority of the Government of the United States." 5 U.S.C. § 551(1). But, as an assistant to the President, Russell possesses no independent "authority" of the United States and therefore neither she nor the PPO is an "agency." *See Soucie v. David*, 448 F.2d 1067, 1075 (D.C. Cir. 1971) (suggesting that a component of the Executive Office of the President whose "sole function [is] to advise and assist the President" would not be an "agency" under the APA); *cf. Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 905 (D.C. Cir. 1993) (expressing "doubt that Congress intended to include the White House or the Executive Office of the President" within the scope of the term "agency" under FACA).

duties.'"  727 F. Supp. 2d 1, 43 (D.D.C. 2010) (quoting *Franklin*, 505 U.S. 802-03; citing *Mississippi*, 71 U.S. (4 Wall.) at 501; *Mellon*, 262 U.S. at 488).  The court further noted that while it would be an "extraordinary measure" to enjoin the President, "so, too, would it be extraordinary for this Court to order declaratory and injunctive relief against the President's top military and intelligence advisors, with respect to military action abroad that the President himself is alleged to have authorized."  *Id.* Similarly, in *Mississippi*,  the Supreme Court denied a request to enjoin not only President Johnson from executing and carrying out the post-Civil War Reconstruction Acts, but the military commander assigned to Mississippi as well. *See* 71 U.S. at 475 (describing bill to enjoin).  The Supreme Court noted the Reconstruction Acts imposed duties on the military commander that "must necessarily be performed under the supervision of the President as commander-in-chief."  *Id.* at 499 (finding such powers "purely executive and political").

Courts apply this reasoning beyond the military context as well.  In *Newdow v. Roberts*, the plaintiff sought injunctive and declaratory relief barring religious prayers or invocations during presidential inauguration ceremonies. *See* 603 F.3d at 1006.  He sued, among others, Chief Justice Roberts, the Presidential Inauguration Committee commissioned by then President-elect Obama, and several ministers invited by the President-elect to deliver religious invocations. *Id.* The court explained that injunctive and declaratory relief against these defendants would not redress the plaintiff's alleged injury because they "possess[ed] no authority—statutory or otherwise—to actually decide whether future inaugural ceremonies will contain the offending religious elements." *Id.* at 1011.  Rather, the details of a presidential inauguration are "subject to the President's or President-elect's discretion" and the court lacked the power to sit in judgment of "a decision committed to the executive discretion of the President or the personal discretion of the President-elect." *Id.* at 1011-12.

The same reasoning applies here.  Russell "possess[es] no authority—statutory or otherwise," *Newdow*, 603 F.3d at 1011, to appoint or remove Board members save when acting at the command of the President.  That decision is assigned by statute to the President alone. *See* 10 U.S.C. § 9455(a)(1); *accord Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93, 100-01 (D.C. Cir. 1995) (holding requested injunctive relief did not redress injury where there was "no possibility" that the already completed

action could be undone).  Section 9455 grants Russell no authority to remove or appoint board members, and the removal letter reflects this—Russell wrote "[o]n behalf of President Biden."  Fourth Am. Compl. ¶ 62.  Indeed, the complaint itself likewise recognizes that it was President Biden's decision alone to remove Stirrup, Lengenfelder, and Gleason, *id.* ¶¶ 20, 96, and nowhere alleges that Russell personally sought to remove them.  Thus, as in *Swan*, "[t]here is little that" Russell "could do that would achieve the ends [Plaintiffs] seek" because "as Assistant to the President, [Russell] has no authority to control" Board operations.  100 F.3d at 979.  Enjoining or issuing declaratory relief against her would either fail to supply a remedy to Stirrup, Lengenfelder, and Gleason or require effectively enjoining the President himself.  Because the complaint fails to plausibly allege what injunctive or declaratory relief against Russell could redress the alleged injury, Stirrup, Lengenfelder, and Gleason have failed to show standing to sue her. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) ("Having found that none of the relief sought by respondent would likely remedy its alleged injury in fact, we must conclude that respondent lacks standing to maintain this suit[.]").

Plaintiffs similarly cannot obtain their requested redress through DFO McDonald.  To be sure, courts have recognized that a challenge to Presidential action can sometimes be sustained where the alleged "injury can be redressed by injunctive relief against subordinate officials." *Swan*, 100 F.3d at 979.  But this is not such a case.  In *Swan*, the D.C. Circuit permitted the plaintiff to proceed against the Executive Director of the National Credit Union Administration ("NCUA") because he possessed independent responsibilities that allowed him to "direct the staff to treat [the plaintiff] as a Board member." *Id.* at 979.  DFO McDonald does not have the authority to direct either staff or other Board members to treat Stirrup, Lengenfelder, and Gleason as Board members.  The DFO's role is administrative in nature and primarily involves calling and attending each meeting. *See* Air Force Academy Board Charter at 2.

That differentiates this case from the jurisdictional decisions in *Spicer v. Biden*, No. 21-cv-2493, 2021 WL 5769458 (D.D.C. Dec. 4, 2021), and *Severino v. Biden*, 21-cv-0314, 2022 WL 168321 (D.D.C. Jan. 19, 2022), *appeal filed*, No 22-5047 (D.C. Cir. Feb. 22, 2022).  In *Spicer*, the plaintiffs named the Naval Academy Board of Visitors' Chairman *and* DFO as defendants.  The Chairman "prepares the

tentative agenda for each Board meeting and is principally responsible for preparing the Board's annual report to the President." *Spicer*, 2021 WL 5769458, at *3. *Spicer* relied on the combination of both the Chairman and the DFO to conclude that the plaintiffs' claims could be redressed. *Id.* Likewise, in *Severino*, the plaintiff named as a defendant the Chairman of the Council of the Administrative Conference of the United States, who had the authority to "be the official spokesman for the Conference, appoint, with approval of the Council, members of committees, and preside at meetings of the Council and at each plenary session of the Conference." *Severino*, 2022 WL 168321, at *4 (citation omitted). The DFO does not have the authority to "treat the plaintiffs as full members of the Board," *Spicer*, 2021 WL 5769458, at *3, and accordingly, the Court cannot grant effective relief against him alone.

Further, the D.C. Circuit in *Swan* based its reasoning in part on construing the complaint broadly because "it seems indisputable" that the plaintiff would have included other NCUA officials as defendants had he thought that his suit against the President, the President's assistant, and the NCUA Executive Director "would not be sufficient to provide the relief he desires." *Swan*, 100 F.3d at 979. By contrast, Plaintiffs have now had numerous attempts to name defendants who might be able to provide them proper redress, and have still fallen short each time. Accordingly, the Court should decline to construe the latest Fourth Amended Complaint as broadly as the D.C. Circuit did in *Swan*. At bottom, Stirrup, Lengenfelder, and Gleason assertion of their removal claims against Defendants Russell and McDonald falls outside of district court jurisdiction, and thus should be dismissed as well.

### B. The President may remove Board members at his discretion.

Even if the Court could grant Stirrup, Lengenfelder, and Gleason relief on their removal challenges, those claims nonetheless lack merit because the President may remove Board members at his discretion. They challenge the President's statutory authority to remove them from the Board on the theory its organic statute contains no express grant of removal power to the President (or to anyone else). But longstanding rules of statutory interpretation hold that an appointing power in a

statute—here, the President—is presumed to have the incidental authority to remove individuals he appoints. Overcoming this well-established, century-old presumption would require clear and definitive language from Congress limiting the appointing power's removal authority. No such language exists in the Act. That alone resolves this case.

Stirrup, Lengenfelder, and Gleason cling to the fact that the statute prescribes a three-year term of service for Presidential appointees. But terms of service operate only as *limitations* on a term of office, rather than as *grants* to the full term. The Board's organic statute thus permits the President to remove any of the six members he appoints at his discretion. And there is no constitutional or statutory reason to *imply* a limitation on the President's removal power into the Board's statute. The Board—as a military commission that is indisputably part of the Executive Branch—is not akin to the traditional independent boards and commissions upon which Congress has chosen to confer *express* for-cause removal protections. The canon of constitutional avoidance strongly supports rejecting any statutory reading that would implicitly restrict the President's ability to remove members of a military commission and encroach on his constitutional authority as Commander-in-Chief.

1. *The power to remove an official from office is incidental to the power to appoint, absent express limitations on the removal authority.*

Section 9455 grants the President the unilateral authority to appoint six members of the Board, without Senate confirmation. *See* 10 U.S.C. § 9455(a)(1). The statute provides no explicit statutory removal protections to these six Presidentially appointed members. *Id.* That ends this case because the Supreme Court has long held "as a matter of statutory interpretation, that, absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'" *Carlucci v. Doe*, 488 U.S. 93, 95 (1988) (quoting *Keim v. United States*, 177 U.S. 290, 293-94 (1900) (collecting cases)); *see also Shurtleff v. United States*, 189 U.S. 311, 316 (1903) (explaining the right of removal "does not exist by virtue of the grant, but . . . inheres in the right to appoint, unless limited by constitution or statute"); *Keim*, 177 U.S. at 293-94 (holding that absent a "specific provision to the contrary" the Secretary of the Interior retained the incidental power to remove clerks he previously appointed).

The Supreme Court reaffirmed this longstanding principle recently, explaining that courts "generally presume that the President holds the power to remove at will executive officers and that a statute must contain 'plain language to take [that power] away.'" *Collins v. Yellen*, 141 S. Ct. 1761, 1783 (2021) (quoting *Shurtleff*, 189 U.S. at 316).[9] That decision restated the Supreme Court's earlier holding in *Shurtleff* that this "usual rule governing the tenure of office" applies barring "plain and explicit language" from Congress limiting the appointing power's right to remove. *Shurtleff*, 189 U.S. at 316. In *Shurtleff*, a general appraiser of merchandise challenged his removal under a statute that provided for removal "from office at any time for inefficiency, neglect of duty, or malfeasance in office." *Id.* at 314. The challenger argued that these express for-cause provisions implicitly excluded termination for any other reason, and that his removal therefore violated the statute because he was not removed on any of these grounds. In determining whether "the officer should only be removed for the causes stated," the Court concluded that "in the absence of constitutional or statutory provision, the President can, by virtue of his general power of appointment, remove an officer, even though appointed by and with the advice and consent of the Senate." *Id.* at 314-15. In view of that presumption, the Court held that to "take away this power of removal in relation to an inferior office created by statute . . . would require *very clear and explicit language*." *Id.* at 315.[10] This power, as a matter of statutory construction, "should not be held to be taken away by mere inference or implication." *Id.* Thus, even if the President's removal power even could constitutionally "have been taken away by an act of Congress,"—particularly where, as here, Congress granted the President alone the power of appointment—"court[s] . . . require explicit language to that effect." *Id.*; *see also Morgan v. Tenn. Valley Auth.*, 115 F.2d 990, 992 (6th Cir. 1940) (explaining in removal context that "curtailment by the Congress of an inherent power of the President, assuming its constitutional validity, is not to be

---

[9] This rule traces its origins to *In re Hennen*, which held that a law granting district courts the power to appoint their own clerks necessarily gave the courts removal power as well. *See* 38 U.S. (13 Pet.) 230, 259 (1839). The Court explained that in "the absence of all constitutional provision, or statutory regulation" it was a "sound and necessary rule, to consider the power of removal as incident to the power of appointment." *Id.* Thus, the clerks "h[e]ld their office at the will and discretion of the head of the department," *id.*, namely the district courts that appointed them. The Court considered this "the settled usage and practical construction of the Constitution and laws." *Id.* at 260.
[10] All emphases are added unless otherwise noted.

implied without clear indication of the legislative purpose"); *cf. Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (explaining the general rule that when "Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear").

Plaintiffs' claim for relief hinges upon the allegation that the statute governing the Board does not provide "for termination of a Presidential appointee by a sitting or successor President." Fourth Am. Compl. ¶ 11. But as explained, statutes do not need to expressly grant appointing officials removal power because such power is presumed, absent clear statutory or constitutional language to the contrary. Because § 9455 contains no such clear limiting language on the President, Plaintiffs cannot succeed on the merits, and their claims fail as a matter of law.

Indeed, two courts in this district have recently upheld the President's removal power under substantively identical scenarios. In *Spicer*, the district court upheld the President's removal of two appointees from the Naval Academy Board (including Plaintiff Spicer) on precisely these grounds, *Spicer*, 2021 WL 5769458, at *3-6, noting that the Supreme Court has "has consistently held that 'the power of removal from office is incident to the power of appointment' 'absent a specific provision to the contrary,'" and "no provision" in the Naval Academy Board's organic statute "specifically insulates members from removal," *id.* at *3 (citing *Carlucci*, 488 U.S. at 95; *Collins*, 141 S. Ct. at 1783; *Keim*, 177 U.S. at 293). And in *Severino*, the district court held that the President could lawfully remove the plaintiff from the Administrative Conference of the United States, another advisory committee. 2022 WL 168321, at *6-7. Explaining that that the "dearth of specific language as to removal is telling," the court concluded that without such language the President could remove the plaintiff at will, even before the expiration of his term. *Id.* at *6.

>    2. *The Supreme Court has established that fixed terms alone do not insulate officials from removal.*

Because § 9455 does not contain "plain language" taking away the President's presumptive removal power over the Board members he appoints, *Collins*, 141 S. Ct. at 1783, Plaintiffs are forced to root their claim on the theory that term appointments constitute an implied form of removal protection. *See* Fourth Am. Compl. ¶¶ 85, 126. Both the *Spicer* and *Severino* courts rejected this exact

argument. *See Spicer*, 2021 WL 5769458, at *4 ("The Supreme Court squarely held in *Parsons* that term-of-office provisions do not independently limit the President's removal power."); *Severino*, 2022 WL 168321, at *6 ("Consistent with this binding precedent, the Court therefore holds that the provision applicable to Plaintiff, '[t]he term of each member, except the Chairman, is 3 years,' does not, as a matter of statutory interpretation, impose a restriction on the President's removal power."). They did so for good reason—this argument has many flaws. As a practical matter, many statutes contain term appointments but are well understood to permit removal by the President, or another appointing official, at any time. That is why federal courts require Congress to use *clear* language when it intends to restrict removal authority. For that reason, the Supreme Court has consistently treated fixed terms alone as supplying no removal protection for well over a century.

That treatment dates back to *Parsons v. United States*, 167 U.S. 324 (1897). There, President Cleveland removed a United States Attorney prior to the end of a statutorily prescribed four-year term. *See id.* at 326. The "question . . . presented [wa]s whether the president of the United States has power to remove a district attorney . . . when such removal occurs within the period of four years from the date of his appointment[.]" *Id.* at 327. The parties, as here, disputed whether the four-year term "provide[d] for the continuance in office for four years at all events, and for a termination at the expiration of that period, or does it mean to provide that the term shall not last longer than four years, subject to the right of the president to sooner remove[.]" *Id.* at 328.[11] In resolving that dispute, the Supreme Court was unequivocal: in view of the President's presumptive removal authority, the statute's four-year term was "a construction of limitation, and not of grant; a construction by which no more than a period of four years is permissible, subject, in the meantime, to the power of the [P]resident to remove." *Id.* at 342.

The *Parsons* holding has governed fixed-term appointments since. The Supreme Court next addressed fixed-term appointments in *Myers v. United States*, which concerned a postmaster dismissed

---

[11] The Court considered the question against the backdrop of a dispute over whether a fixed term barring the President's removal power "would be constitutional." *Parsons*, 167 U.S. at 328. In concluding the statute permitted removal prior to the term's end, the Court found it "unnecessary . . . to determine the important question of constitutional power above stated." *Id.* at 334-35.

by President Wilson prior to the expiration of his four-year term. *See* 272 U.S. at 107. The statute there provided that postmasters "shall hold their offices for four years" but "may be removed by the President by and with the advice and consent of the Senate." *Id.* (quoting Act of Congress of July 12, 1876, 19 Stat. 80, 81, ch. 179). Myers' estate alleged that he had been unlawfully removed without the Senate's consent before his term expired. *Id.* at 108. The Court held that requiring the Senate's consent to remove him violated the separation of powers, but did not find that the four-year term itself limited the President's removal power, even though the statute stated the postmaster "shall" serve for four years. *Id.*

Critically, both the majority and several dissenters affirmed the holding in *Parsons*. *See Spicer*, 2021 WL 5769458, at *4 ("*Myers* thus clarified that *Parsons* governs the construction of all term-of-office provisions, not only the provision that was directly before the *Parsons* Court"). Chief Justice Taft, writing for the majority, agreed with *Parsons*' conclusions that (1) no express grant of removal power to the President was necessary in view of Congress's understanding of the President's removal power; and (2) that a fixed term does not provide a "term that shall last, at all events, for that time." *Myers*, 272 U.S. at 147 (quoting *Parsons*, 167 U.S. at 339). Discussing the first point, the Chief Justice explained that these grants were included only to "avoid any inference from the fixing of the term that a conflict" with the President's removal power was intended. *Id.* at 146. In other words, to confirm what was already understood—that a term appointment did not limit the President's removal authority. Justice Brandeis, dissenting, agreed that "[a]ll questions of statutory construction have been eliminated by the language of the act" at issue. *Id.* at 241. Specifically, Justice Brandeis found it "settled that . . . the clause fixing the tenure [of the postmaster] will be construed as a limitation, not as a grant, and that, under such legislation, the President, acting alone, has the power of removal." *Id* (citing *Parsons*, 167 U.S. 324). He thus considered it "settled" as a matter of "statutory construction" that the statute's four-year term provided no protection to Myers, and that the only issue in the case was the constitutionality of Congress's desire "to preclude a removal without the consent of the Senate." *Id.* Justice McReynolds, also dissenting, likewise admitted that *Parsons* "does express the view that by practical construction prior to 1820 the President had power to remove an officer appointed

for a fixed term." *Id.* at 226. Justice McReynolds found this view to be a "mistake," *id.*, but nonetheless recognized it as the rule of *Parsons*.

*Myers*, in turn, was followed by *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which did nothing to displace *Parsons*. The relevant statute in *Humphrey's Executor* provided Federal Trade Commission members with fixed, staggered terms but also provided that they "may be removed by the President for inefficiency, neglect of duty, or malfeasance in office[.]" *Id.* at 619. The Court found *the combination* of a fixed term with an express for-cause removal provision "definite and unambiguous." *Id.* at 623. As the Court recognized, this statute clearly limited the President's removal ability. *See, e.g., id.* ("the fixing of a definite term *subject to removal for cause* . . . is enough to establish the legislative intent that the term is not to be curtailed *in the absence of such cause*"); *id.* at 624 (finding it "clear upon the face of the statute" that Congress intended "that no removal should be made during the specified term except for one or more of the enumerated causes"); *id.* at 626 (concluding "that the intent of the act is to limit the executive power of removal to the causes enumerated"). The Court thus held that fixed terms combined with for-cause removal "establish the legislative intent that the term is not to be curtailed in the absence of such cause"; the decision is silent as to fixed terms alone. *Id.* at 623.

With that statutory construction in hand, the Court concluded that "depend[ing] upon the character of the office," Congress may constitutionally "fix[] a definite term *and preclud[e] a removal except for cause*." *Id.* at 631. "Nothing in *Humphrey's Executor* . . . suggests that the Court meant to abandon the basic default rule of *Parsons* and *Shurtleff* that Congress must speak in clear terms to create for-cause tenure; on the contrary, the Court's point was merely that the express statutory enumeration of for-cause grounds and of a limited term were sufficient to overcome that default rule." Adrian Vermeule, *Conventions of Agency Independence*, 113 Colum. L. Rev. 1163, 1171 (2013). Indeed, the Court later explained that *Humphrey's Executor* held Congress may sometimes "condition the [President's power of removal] by fixing a definite term *and precluding a removal except for cause*." *Morrison v. Olson*, 487 U.S. 654, 687-88 (1988) (quoting *Humphrey's Executor*, 295 U.S. at 631). The Supreme Court has *never* stated that a fixed term alone limits the appointing power's removal authority; such a limitation

is instead conditioned on a fixed term in combination with *express* for-cause removal terms providing for removal in at least some instances.  *See* Marshall Breger & Gary Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1138 (2000) (explaining that "a fixed term of years . . . alone is not sufficient" to restrict removal and for-cause removal is the "critical element").

   The Supreme Court's recent removal decisions further show that fixed terms alone place no limit on Presidential removal power. *See Spicer*, 2021 WL 5769458, at *4 ("The Supreme Court's recent removal cases are also consistent with a broad reading of *Parsons*.").  For example, *Collins v. Yellen* concerned the constitutionality of the Federal Housing Finance Agency, whose single Director "serves a 5-year term but may be removed by the President 'for cause.'" 141 S. Ct. at 1771 (quoting 12 U.S.C. § 4512(b)(2)).  The Court was clear that it was the "for-cause restriction on the President's removal authority [that] violate[d] the separation of powers," and not the fixed term. *Id.* at 1783; *see also id.* at 1786; *id.* at 1806 (Sotomayor, J., concurring) (framing the issue as "whether this Court's decisions upholding for-cause removal provisions in *Humphrey's Executor* and *Morrison* should be 'extend[ed]' to the [] Director").  Most tellingly, the Court rejected the idea that labeling an agency as "independent" implied removal protections.  It explained that "Congress has described many agencies as 'independent' without imposing any restriction on the President's power to remove the agency's leadership." *Id.* at 1782-83 (collecting examples).  Five of the six agencies the Court cited for that proposition provide fixed-term tenures, confirming the Court's view that such terms alone do not impose "any restriction on the President's power to remove." *Id.* at 1782; *see* Kirti Datla & Richard Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 790, Table 2 (2013) (identifying agencies with fixed terms but no removal protections).

   Likewise, in *Seila Law LLC v. Consumer Financial Protection Bureau*, the Court considered the constitutionality of a statute granting the Director of the Consumer Financial Protection Bureau a five-year term and for-cause removal protections.  *See* 140 S. Ct. 2183, 2197 (2020).  It found that the statute violated the separation of powers because the Director was "removable only for cause" but not because of her five-year term. *Id.* at 2194. Critically, when considering how to remedy the

violation, the Court severed only the statute's for-cause subsection, but *not* its five-year term subsection. *See id.* at 2204, 2211 (distinguishing the for-cause removal protection in § 5491(c)(3) from the grant of a five-year term in § 5491(c)(1) and later finding the "removal protection severable from the other provisions of Dodd-Frank"); *id.* at 2219 (disagreeing with the Court's "decision to sever the removal restriction in 12 U.S.C. § 5491(c)(3)") (Thomas, J., concurring in part and dissenting in part). [12] Previously, in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, the Court similarly severed two subsections limiting removal of Board members for "good cause shown," but left untouched a subsection granting those members five-year terms. *See* 561 U.S. 477, 503 n.7 (2010) (severing for-cause removal restrictions in §§ 7211(e)(6), 7217(d)(3) but keeping five-year term in § 7211(e)(5)). Severing the "removal restrictions" left the Board members "removable . . . at will" despite their continuing to hold fixed terms. *Id.* at 509. Each of these cases underscores the Court's desire to give the President *more* removal authority and the continued unlawfulness of attempts to restrict it.

In light of this century-long pedigree in the Supreme Court, the "long-standing rule in the federal courts [is] that a fixed term merely provides a time for the term to end." *Pievsky v. Ridge*, 98 F.3d 730, 734 (3d Cir. 1996) (citing *Parsons*, 167 U.S. 324); *see also Stanley v. Gonzales*, 476 F.3d 653, 660 (9th Cir. 2007) (explaining that "appointment to a position for a fixed term does not in itself require that [the occupant] be allowed to serve the entire term, absent removal for cause" (citing *Parsons*, 167 U.S. at 339); *Stanley v. DOJ*, 423 F.3d 1271, 1274 (Fed. Cir. 2005) (it is "not the law" that a bankruptcy trustee is entitled to serve his full five-year term because "because inferior officers may be removed before the end of their statutorily defined term" (citing *Parsons*, 167 U.S. at 329)); *United States ex rel. Frizzell v. Newman*, 42 App. D.C. 78, 100 (D.C. Cir. 1914) (finding it "undoubtedly within the power of the President to remove a commissioner of the District [of Columbia] from office" despite

---

[12] Then-Judge Kavanaugh reached the same conclusion in a parallel challenge to the CFPB Director's statutory removal protection, explaining he "would not invalidate and sever the tenure provision" because "those kinds of tenure provisions do not prevent the President from removing at will a Director at any time during the Director's tenure." *PHH Corp. v. CFPB*, 881 F.3d 75, 200 n.20 (D.C. Cir. 2018) (citing *Parsons*, 167 U.S. at 343) (en banc) (Kavanaugh, J., dissenting). He further explained that if such fixed terms *did* restrict the President's removal power, they would likely be unconstitutional. *Id.*

otherwise being "appointed for a term of three years" (citing *Parsons*, 167 U.S. 324)); *Farley v. United States*, 139 F. Supp. 757, 758 (Ct. Cl. 1956) ("It is settled that the President can remove an executive officer before the expiration of the statutory term of office." (citing *Parsons*, 167 U.S. 324)).

*Pievsky* provides an example of how this longstanding rule plays out today. That case concerned an interstate compact "governed by federal law." 98 F.3d at 733. The dispute at issue, as here, was "strictly one of statutory construction," namely whether the compact permitted the Governor "to remove a commissioner . . . at will and prior to the expiration of h[er] term[.]" *Id.* The removed commissioner argued—as Plaintiffs do—that he could not be removed prior to the expiration of his five-year term because "five years means five years, and not less than five years." *Id.* at 734. The Court was "not persuaded," and, citing *Parsons*, held the term was "a means of limiting the length of the term of office, not as a prohibition on the Governor's removal authority." *Id. Parsons* and its progeny command the same result here.

### 3. The constitutional avoidance canon further counsels against reading removal protections into the statutes.

Because § 9455 contains no express restrictions on the President's removal authority, and because fixed terms alone do not imply removal protections, the statute unambiguously grants the President the authority to remove the members he appoints. But even if the statute was ambiguous, the avoidance canon further weighs in favor of Defendants' construction. Under that canon, it is the "settled policy" of federal courts "to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Richardson v. United States*, 526 U.S. 813, 820 (1999) (citation omitted).

*First*, *Seila Law* explained that *Humphrey's Executor* "held that Congress could create expert agencies led by a *group* of principal officers removable by the President only for good cause." 140 S. Ct. at 2192. While the Court need not reach the issue, it is doubtful that *any* members of the Board, particularly those individuals appointed by the President, qualify as principal officers. The Congressional members, for their part, are not principal officers within the context of the Appointments Clause because their election is separately provided for in Article I. And the six

Presidentially appointed members are not likely principal officers because they are not confirmed by the Senate, which is a requirement for principal officers under the Constitution. *See* U.S. Const., art. II, § 2, cl. 2. Stirrup, Lengenfelder, and Gleason offer no argument that Board members qualify as principal officers, never mind that the Board is led by a *group* of such officers. Plaintiffs therefore ask the Court to extend *Humphrey's Executor* to "a new situation not yet encountered by the Court," *Free Enter. Fund.*, 561 U.S. at 483, namely a multi-member Board led by non-Senate confirmed officers who may not be removed by the President during their terms. But the Court need not reach that novel scenario because the statute plainly supplies no removal protections to Board members.

*Second*, *Morrison* held that Congress could limit the President's removal power over inferior officers where "the Attorney General retain[ed] the power to remove the [officer] for 'good cause,'" which was sufficient to "provides the Executive with substantial ability to ensure that the laws are 'faithfully executed' by" such an officer. *Morrison*, 487 U.S. at 696. Indeed, every Supreme Court case addressing the President's removal power has contemplated the President having, at minimum, for-cause removal power. *See supra* Section I.B.1. As *Seila Law* explains, *Humphrey's Executor* held only that Congress could create certain multimember commissions whose members are "removable by the President only for good cause." 140 S. Ct. at 2192. But Stirrup, Lengenfelder, and Gleason urge this Court to go further and to read a statute as *eliminating* the President's removal power altogether for years at a time, even for good cause—a scenario the Supreme Court has never blessed and that this Court should not strain the statutory text to reach. Indeed, the *Parsons* Court similarly avoided resolving that question by concluding as a statutory matter that the President could remove U.S. Attorney's during their terms. *See Parsons*, 167 U.S. at 328 (explaining if the statute was "construed in accordance with the claim of [the] appellant, the further question would then arise whether a statute which fixed a term of office . . . during the running of which" the President "should [not] have power to remove the incumbent from office would be constitutional").

*Third*, Stirrup, Lengenfelder, and Gleason's argument would call into question the constitutionality of dozens of other fixed-term-only statutes that could then, under Plaintiffs' rule, be read as fully insulating those officeholders from Presidential removal. As explained, the Supreme

Court has never condoned insulating an officer from for-cause removal and the Court should reject a statutory construction that, if generally adopted, would result in a widespread, and constitutionally-doubtful, limitation on the President's authority.

*Finally*, the Board is not an ordinary civil agency. The President is the Commander-in-Chief and is entitled to significant deference in his supervision and management of the military. *See, e.g.*, *Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975). The Court should not strain to read § 9455 to require the President to accept military counsel from those he does not wish to hear it from.

### C. Plaintiffs Stirrup, Lengenfelder, and Gleason have failed to state a claim for breach of contract.

Stirrup, Lengenfelder, and Gleason also bring a breach of contract claim, contending that their removal violated a "binding commitment from the President of the United States for a three-year term." Fourth Am. Compl. ¶ 132. But they point to no actual contracts governing the terms of their Board membership. Indeed, they have not alleged a single fact supporting any of the elements of a breach of contract claim. To state a claim for a breach of contract, plaintiffs must demonstrate: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior*, 624 F. Supp. 2d 1, 12 (D.D.C. 2009) (citation omitted). Plaintiffs have established none of these elements.

*First*, Stirrup, Lengenfelder, and Gleason have not alleged that a validly enforceable contract exists between themselves and the President. The Complaint is devoid of any details of this so-called "contract." They claim that the President violated a "strict contractual provision," Fourth Am. Compl. ¶ 133, but provide no inkling of what this provision states. A court "may not 'accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.'" *Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 90 (D.D.C. 2011) (citing *Kowal v. MCI Comm'ns Corp.*, 16 F.3d

1271, 1276 (D.C. Cir. 1994)).  Because Stirrup, Lengenfelder, and Gleason have failed to allege any facts supporting the existence of a contract, their claims should be dismissed on this basis alone.

*Second*, for the reasons already noted, *see supra* Section II.B, the President breached no duty because he may lawfully remove Air Force Academy Board members at his discretion.  As explained, absent clear statutory language to the contrary, the President's authority to remove Board members is incidental to his power to appoint them.  And a three-year term does not act as a restriction on this removal power. *See Spicer*, 2021 WL 5769458, at *4; *Severino*, 2022 WL 168321, at *6.

*Third*, even if Stirrup, Lengenfelder, and Gleason were able to identify a validly enforceable contract, they have not established that they are entitled to the "unusual remedy" of equitable relief—here, an injunction reinstating them to the Board. *See Klayman v. Jud. Watch, Inc.*, 628 F. Supp. 2d 112, 127 (D.D.C. 2009), *aff'd*, 6 F.4th 1301 (D.C. Cir. 2021).  "It is well established that courts generally do not order specific performance of personal service contracts." *Meyers v. Trinity Coll.*, No. CV 95 553687, 1995 WL 684815, at *2 (Conn. Super. Ct. Nov. 8, 1995); *see also* Restatement (Second) of Contracts § 367 cmt.a (1981) ("A court will refuse to grant specific performance of a contract for service or supervision that is personal in nature.").  This extends to the employment context, as "courts have refused to order employers to reinstate employees as a remedy for the breach of an employment contract." *Hopkins v. Price Waterhouse*, 920 F.2d 967, 980 (D.C. Cir. 1990).  And separation of powers principles strongly counsel against forcing the President to reappoint a member the President, in his own discretion, chose to remove. *Cf. Greene v. Howard Univ.*, 271 F. Supp. 609, 615 (D.D.C 1967) (noting that employment contract "is not within those few categories of agreements that are enforceable in equity" and because "[i]t would be intolerable for the courts to interject themselves and to require an educational institution to hire or to maintain on its staff a professor or instructor whom it deemed undesirable and did not wish to employ.").  For all of these reasons, Plaintiffs have failed to state a breach of contract claim.

**D. Plaintiffs Stirrup, Lengenfelder, and Gleason have failed to allege that their removal was impermissible viewpoint discrimination.**

Stirrup, Lengenfelder, and Gleason's attempt to shoehorn their dissatisfaction over their lawful removal into a viewpoint discrimination claim similarly falls short.[13]   *See* Fourth Am. Compl. ¶ 142. Again, they have failed to allege sufficient facts to support this claim.   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).   The Fourth Amended Complaint simply fails to set forth any specific instances in which Stirrup, Lengenfelder, or Gleason engaged in any speech, much less speech that might enjoy First Amendment protection.   Without any factual allegation of speech, none of these Plaintiffs can state a claim.

And even if the Fourth Amended Complaint had alleged any actual instances of speech by any Plaintiff, any such alleged speech involving Board matters would enjoy no First Amendment protection.   "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."   *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Nor does the First Amendment empower public employees to "constitutionalize the employee grievance."   *Id.* at 420 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)) *see also Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (when applying Pickering analysis, government can properly regulate speech that "[i]nterferes with work, personnel relationships, or the speaker's job performance").   Finally, the viewpoint discrimination doctrine itself has no bearing on Plaintiffs' claims: Under long-established jurisprudence, the doctrine encompasses First Amendment challenges to broad ordinances or generally applicable guidelines in various contexts, not employment or personnel disputes—and certainly not individual removal decisions by the President.   *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S.

---

[13] Plaintiffs do not appear to bring a retaliation claim under the First Amendment—indeed, the Complaint makes no reference to retaliation, and Stirrup, Lengenfelder, and Gleason specify that they are bringing a viewpoint discrimination claim.   *See* Fourth Am. Compl. ¶¶ 136-38.   This Court should not "interpret Plaintiffs' action to seek relief that it does not clearly seek" because Plaintiffs "are 'masters of the complaint,' free to choose the relief they seek."   *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 134 n.11 (D.D.C. 2018) (citation omitted).

155, 159 (2015) (challenging town code regulating outdoors signs); *Rosenberger v. Rector & Visitors of the Univ. of Va*, 515 U.S. 819, 824-28 (1995) (challenging university guidelines regulating group funding).

The only potential support in the Complaint for the assertion that Stirrup, Lengenfelder, and Gleason were removed from the Board due to their political views rests on two articles from the New York Times and the Daily Mail. Fourth Am. Compl.¶ 2 n.1-3. And even there, Plaintiffs misconstrue the New York Times article—it states not that Plaintiffs were removed because "they were not 'aligned with the President's values,'" *id.* ¶ 2, but only that the Biden administration "was seeking to ensure that nominees and board members were 'qualified to serve on them' and 'aligned' with the president's values," Chris Cameron, NEW YORK TIMES, White House Forces Out Trump Appointees From Boards of Military Academies (Sept. 8, 2021), https://www.nytimes.com/2021/09/08/us/politics/trump-appointees-military-academy-boards.html.   For its part, the Daily Mail article does not even specifically mention any of the Plaintiffs challenging their removal in this action.   Katelyn Caralle & Rob Crilly, DAILYMAIL.COM (Sept. 9, 2021), https://www.dailymail.co.uk/news/article-9973659/Jen-Psaki-insists-Joe-Biden-right-kick-Trump-picks-militaryacademy-advisory-boards.html. Neither article identifies any protected speech by Stirrup, Lengenfelder, or Gleason.

Beyond the Fourth Amended Complaint's basic factual pleading failures on this count, it would fail for legal reasons.  The "plausibility standard" required to survive a Rule 12(b)(1) motion to dismiss "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  Here, even if Stirrup, Lengenfelder, and Gleason had plausibly alleged that the President removed them due to differences in policy views, it would not violate the First Amendment.  The President is not prohibited from removing high-level appointees with whom he disagrees on policy matters; rather, just as he is entitled to appoint persons who share his policy views and priorities, he is entitled to remove Presidential appointees who do not.  *See, e.g.*, *Myers*, 272 U.S. at 134 (explaining that the President can remove officers who "discharge[] a political duty of the President" because "the imperative reasons requiring an unrestricted power to remove the most important of his subordinates in their most important duties must therefore control the interpretation of the Constitution as to all appointed by him").  This is a quintessential Presidential power.  *See* Datla & Revesz, 98 Cornell L.

Rev. at 787 ("The ability to remove an agency head at will is an enforcement tool that helps the President ensure that the agency follows his policy preferences.").

Ultimately, Plaintiffs have made no factual allegation that their political views were the basis for their removals. And even if they had, there is no plausible legal argument that the First Amendment bars the President from removing a prior President's political appointees after taking office. Accordingly, Stirrup, Lengenfelder, and Gleason's removal-based viewpoint discrimination claims should be dismissed.

## II.   Plaintiffs' Claims Challenging the Temporary Suspension of the Boards Should Be Dismissed.

### A. This Court has no jurisdiction over Plaintiffs' challenges to the Boards' suspensions.

Plaintiffs' challenge to the temporary suspension of the Boards' operations suffers from a host of jurisdictional defects. Because the zero-based review has concluded and Board activity has resumed, any alleged injury occurred in the past. Plaintiffs have no standing to seek only declaratory relief and a prospective injunction that "[p]ermanently enjoin[s] Defendants . . . from suspending [the Boards] in the future." Fourth Am. Compl., Prayer for Relief. Plaintiffs have not shown that another suspension is likely to occur in the future (and anyway, Plaintiffs Stirrup, Lengenfelder, Gleason, Spicer, and Norman do not even currently serve on any Boards). Further, because the Boards are no longer suspended, any claims regarding this temporary pause have been rendered moot. Last, the Secretary's decision to conduct a zero-based review of the Department of Defense's advisory committees—a brief study examining the value add of advisory committees across the Department— is not a final agency action that is cognizable under the APA.

> 1. *Plaintiffs have no standing to seek declaratory and injunctive relief based on only past action.*

Plaintiffs request that the Court "[d]eclare the suspension of" the Boards to be illegal and that it "[p]ermanently enjoin Defendants . . . from suspending in the future" the Boards. Fourth Am. Compl., Prayer for Relief. Because the Boards are no longer suspended, they seek injunctive and

35

declaratory relief to remedy a past injury. "In a case of this sort, where the plaintiffs seek declaratory and injunctive relief, past injuries alone are insufficient to establish standing." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). Instead, they must show they are "suffering an ongoing injury or face[] an immediate threat of injury." *Id.* "Abstract injury is not enough," rather, the injury must be "both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (internal quotation marks omitted).

Plaintiffs do not allege that the Board suspensions remain ongoing. They acknowledge that the Boards were reinstated on September 17, 2021. *See* Fourth Am. Compl. ¶ 1, 23; *id.* Ex. 1. And they do not even attempt to show any immediate threat of injury. Instead, they merely assert in conclusory fashion that "any such suspension or interference is capable of repetition but will evade review in the absence of this lawsuit." Fourth Am. Compl. ¶¶ 97, 115, 131. Even if that boilerplate recitation were correct, it would not come close to showing that Plaintiffs themselves face an "immediate" threat that Board activity may be suspended again: the vague statement that an earlier Board suspension "is capable of repetition" is entirely "conjectural," *Lyons*, 461 U.S. at 102, 109, and the Complaint alleges no facts suggesting otherwise.

The prospective relief requested in this case substantively resembles that sought in *Lyons*, where the Supreme Court held that evidence of past injury could not support prospective equitable relief. There, the plaintiff, who had been subjected to a chokehold under an alleged police department policy, sought an injunction barring future chokehold use. *Id.* at 98. Explaining that "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy," the Court held that the plaintiff's past exposure to a police chokehold did "nothing to establish a real and immediate threat" of the same conduct occurring in the future. *Id.* at 103-05; *see also O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing,

36

present adverse effects."); *Rizzo v. Goode*, 423 U.S. 362, 372 (1976) (rejecting standing claim predicated on "attenuated" hypothesis of future injury).  Likewise, Plaintiffs cannot base standing to seek prospective equitable relief only on a single, short-term Board suspension that has since concluded.

That Plaintiffs also seek declaratory judgment does not change this analysis.  *Lyons* also barred the plaintiff from seeking declaratory relief stating that the use of chokeholds was illegal.  461 U.S. at 98.  Similarly, here, a bare assertion of past harm without any allegations of future injury "does not create the actual controversy that must exist for a declaratory judgment to be entered."  *Id.* at 104; *see also Golden v. Zwickler*, 394 U.S. 103, 108-09 (1969) (holding former Congressman lacked standing to seek declaratory judgment declaring elections statute unlawful because it was "most unlikely" that he would run for reelection and be subject to the statute once again).  Plaintiffs have thus not demonstrated a "case or controversy . . . that would justify the equitable relief sought."  *Lyons*, 461 U.S. at 105.

### 2. *Because the Board has been reinstated, any challenges to the Board suspension are moot.*

Even if Plaintiffs could show standing to challenge the zero-based review and Board suspensions, their claims would be moot because the review has concluded and the Boards are no longer suspended.  "A lawsuit becomes moot—and is therefore no longer a 'Case' or 'Controversy'— 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'"  *Almaqrami v. Pompeo*, 933 F.3d 774, 779 (D.C. Cir. 2019) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).  A case is moot when "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."  *Transwestern Pipeline Co. v. Fed. Energy Regul. Comm'n*, 897 F.2d 570, 575 (D.C. Cir. 1990).

Such is the case here.  As Plaintiffs readily acknowledge, the Secretary concluded the zero-based review on September 17, 2021, and the Boards have been reinstated.  Fourth Am. Compl. ¶ 23; *id.* Ex. 1.  Since then, the Naval Academy Board met on February 28, 2022, *see* USNA, Office of the

Superintendent, Board of Visitors, https://www.usna.edu/PAO/Superintendent/bov.php (last accessed May 9, 2022), the USMA Board met on March 2, 2022, *see* USMA, Upcoming Meetings, https://www.westpoint.edu/about/superintendent/board-of-visitors/upcoming-meetings (last accessed May 9, 2022), and the Air Force Academy Board met on April 13, 2022, *see* USAFA, About, https://www.usafa.edu/about/bov/ (last accessed May 9, 2022).  The dispute over whether the Secretary had the authority to temporarily suspend Board operations last year therefore is "no longer embedded in any actual controversy about the plaintiffs' particular legal rights," but is an "abstract dispute about the law," which "falls outside the scope of the constitutional words 'Cases' and 'Controversies.'"  *Alvarez v. Smith*, 558 U.S. 87, 93 (2009).  Because the Boards are not currently suspended, any decision by this Court over the lawfulness of that past suspension will not have any present effect on Plaintiffs' rights.

Plaintiffs' attempt to skirt this limitation by seeking declaratory relief and an injunction predicated upon an alleged "future" suspension, *see* Fourth Am. Compl., Prayer for Relief, falls short.  "That mootness of a claim against a specific agency action also moots claims for declaratory relief over those specific agency actions is well-attested in D.C. Circuit precedent."  *People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv.* ("*PETA*"), 59 F. Supp. 3d 91, 96 (D.D.C. 2014); *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1429 (D.C. Cir. 1994) ("[I]f a plaintiff has made no challenge to some ongoing underlying policy, but merely attacks an isolated agency action, then the mooting of the specific claim moots any claim for a declaratory judgment that the specific action[s] was unlawful.").  And as explained, Plaintiffs have made no allegation of any "more-than-speculative chance" that the Boards will again be subject to this type of zero-based review—and concurrent brief suspension—in the future.  *See Transwestern Pipeline*, 897 F.2d at 575.  "[A]ttempting

to anticipate" whether and when another review would occur "takes us into the area of speculation and conjecture." *O'Shea*, 414 U.S. at 497.

In response, Plaintiffs may argue that their claim falls within the capable of repetition, yet evading review exception to mootness. But that doctrine does not apply here. It applies when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). That test "requires that the challenged action be *both* capable of repetition *and* evading review; a deficiency in one area renders the exception itself moot." *PETA*, 59 F. Supp. 3d at 97. And it "applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109.

No such "exceptional situation" exists here. Plaintiffs have not even alleged that the Boards will likely undergo *another* zero-based review that would result in *another* suspension. Instead, they make the conclusory assertion that "such suspension is capable of repetition but evading review." Fourth Am. Compl, Prayer for Relief. Courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Twombly*, 550 U.S. at 555 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." (citation omitted)). Moreover, plaintiffs cannot satisfy the case-or-controversy requirement with "general assertions or inferences" that a given past activity may occur in the future. *O'Shea*, 414 U.S. at 497. And any suggestion that the Secretary may soon announce another review temporarily pausing Board activity is "purely speculative," and so cannot satisfy this exception. *Umbert v. United States*, No. 18-cv-1336, 2019 WL 4305576, at *6 (D.D.C. Sept. 11, 2019).

Moreover, for the capable of repetition yet evading review doctrine to apply, "a plaintiff [must] make a full attempt to prevent his case from becoming moot, an obligation that includes filing for

preliminary injunctions[.]"   *Newdow*, 603 F.3d at 1009.  Not only have Plaintiffs declined to file a preliminary injunction,  but they have chosen to amend their Complaint four times in the nine months since they brought this suit.  *See* ECF No. 1; ECF No. 5; ECF No. 12; ECF No. 16; ECF No. 37. Plaintiffs did not even effectuate service upon Defendants until almost five months after filing suit. *See* ECF No. 21.  Accordingly, any claims relating to the now-concluded zero-based review and suspension of the Boards are moot and not justiciable by this Court.

> 3. *The zero-based review is not a final agency action and is not reviewable under the APA.*

The APA provides review only of final agency action—*i.e.*, a decision (1) that marks the "consummation of the agency's decisionmaking process" and (2) by which "rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).  Neither prong is met here.

The zero-based review and its corresponding suspension of Board operations were short-term measures intended to foster a thorough evaluation of advisory committees, not the "consummation of the agency's decisionmaking process."  *Id.*  For the first prong, courts look to "whether the action is 'informal, or only the ruling of a subordinate official, or tentative.'"  *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967)).  The stated purpose of the review was to "assess" the committees, not to make any final decisions.  It directed Defense personnel to consider the "business case" for each committee and to "make final recommendations to [the Secretary] on each DoD advisory committee, to include retention, realignment, termination, changes to mission or functions, membership balance, membership size, and possible legislative changes to non-discretionary advisory committees."  Fourth Am. Compl., Ex. 6 at 5.  The zero-based review did not alter anything about these committees until the Secretary decided to eventually take action on the recommendations.  *See id.*  Secretary Austin specifically noted that the suspension of operations was an "interim step."  Fourth Am. Compl.. Ex.

1 at 1. And immediately after the review concluded, he instructed the Boards to "immediately resume operations," underscoring the temporary nature of the brief suspension. *See id.*

Moreover, the temporary suspension of the Boards altered no legal rights for anyone. After the Secretary announced the zero-based review, DFO McDonald explained that members "board membership will not be impacted." Fourth Am. Compl., Ex. 5. The Boards do not directly regulate any parties—their functions are purely advisory. *See Spicer*, 2021 WL 5769458, at *5 (explaining that the "only role" of the Naval Academy Board is "to advise the president" and that "Board members lack any non-advisory authority"). As such, they have no impact on anyone else's legal rights. Accordingly, the temporary suspension of Board operations is not a final agency action and this Court should dismiss Plaintiffs' APA claims with respect to this action.

### B. Plaintiffs have not made a proper showing that the Secretary lacked the authority to suspend advisory committees pending the zero-based review.

Even if the Court did find it had jurisdiction to hear Plaintiffs' challenges to the now-concluded suspensions, the Secretary was well within his authority to order review of the Department of Defense's advisory committees and temporarily pause their operations in order to complete this review.[14] The Secretary announced the zero-based review as one broadly encompassing all advisory committees within the Department of Defense, not just the Boards, and one intended to "ensure each advisory committee provides appropriate value today and in the future, as times and requirements

---

[14] Plaintiffs' complaint that "critical decisions" were made during the suspension of the Boards' activities, *see* Fourth Am. Compl. ¶ 18, is not relevant to the issue of whether the suspension was lawful. But even if Board activity had not been paused, the Boards would have had no role in the actual decisionmaking process. The Boards are "advisory only" and "all matters under their consideration should be determined . . . by the official, agency, or officer involved." 5 U.S.C. App. 2 § 2(b)(6); *see also id.* § 9(b) ("[A]dvisory committees shall be utilized solely for advisory functions. Determinations of action to be taken and policy to be expressed with respect to matters upon which an advisory committee reports or makes recommendations shall be made solely by the President or an officer of the Federal Government."); Air Force Academy Board Bylaws Art. I ("Unlike a corporate board of directors, this Board cannot be directive in its oversight role. The Board is an advisory board charged with providing independent advice and recommendations on matters relating to the U.S. Air Force Academy.")

change." Fourth Am. Compl., Ex. 6 at 4.

As "advisory committee[s]," the Boards are subject to the requirements of FACA. *See* Fourth Am. Compl. Ex. 1 at 1 ("As [] Federal advisory committee[s]," the Boards are "subject to the Federal Advisory Committee Act."). FACA defines "advisory committees" as "any . . . board . . . which is established by statute . . . in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." 5 U.S.C. App. 2 § 3(2)(A). The statute also mandates that its provisions "shall apply to each advisory committee," *id.* § 4(a), including the Boards.

FACA further specifies that "[t]here shall be designated an officer or employee of the Federal Government to chair or attend each meeting of each advisory committee"—in the case of the Boards, the DFOs. 5 U.S.C. App. 2 § 10(e). The DFO is thus "authorized, whenever he determines it to be in the public interest, to adjourn any such meeting," and "[n]o advisory committee shall conduct any meeting in the absence of that officer[.]" *Id.* Moreover, advisory committees "shall not hold any meetings except at the call of, or with the advance approval of, a designated officer or employee of the Federal Government." *Id.* § 10(f).

Here, the DFOs adjourned meetings of the Boards during the pendency of the zero-based review. As set forth in the Complaint, when the review was announced, Air Force Academy Board DFO McDonald notified Board members that the Boards "remain[ed] in place" and that "board membership [would] not be impacted," but that the "board will not hold any meetings" until the Secretary concluded the review. Fourth Am. Compl., Ex. 5. Consistent with his statutory authority under FACA, McDonald adjourned meetings of the Board, and did not "call" or give any "advance approval" to hold a new meeting during the pendency of the zero-based review. *See* 5 U.S.C. App. 2 § 10(e), (f). In no way has he "sabotaged" the Board system by unlawfully suspending the activity of the Boards. Fourth Am. Compl. ¶ 1.

Nor does the suspension of Board operations violate the Constitution.  Specifically, Plaintiffs appear to contend that the suspension violates the Article I, § 8, Clause 14 of the Constitution, which empowers Congress to "make Rules for the Government and Regulation of the land and naval Forces."  U.S. Const., art. I, § 8, cl. 14.  But this Constitutional provision has no relevance here.  For starters, a temporary pause in operations pursuant to a general review of all advisory committees does not constitute a "Rule[] for the . . . Regulation of the land and naval Forces."  *See, e.g., Solorio v. United States*, 483 U.S. 435, 438 (1987) (explaining that Congress exercised its authority under Section 8, Clause 14 when it enacted a statute that "empowered courts-martial to try servicemen for" certain crimes).  Further, as explained, the DFO acted pursuant to authority that Congress, through FACA, lawfully delegated to him.  In no way does that amount to an encroachment on Congress' authority to enact statutes regulating the military.

### C. Plaintiffs have failed to allege that the suspension of the Boards constituted impermissible viewpoint discrimination.

In Count Three, Plaintiffs also claim that Defendants "engaged in explicit viewpoint discrimination" by temporarily suspending the Boards and "thereby avoiding the recommendations, discussions, opinions and other inputs of [Board] members and of members of the public to [the Boards]."  Fourth Am. Compl. ¶ 142.  This claim suffers from a host of defects.

Plaintiffs have again failed to articulate any facts to support this claim.  *See supra* Section I.D. Baldly asserting that the suspension implemented under a general, agency-wide review of all advisory committees was somehow prompted by Stirrup, Lengenfelder, Gleason, and Green taking "positions" that the "Administration disliked," *see* Fourth Am. Compl. ¶ 142, is implausible on its face.  Plaintiffs have made no specific allegations tying this decision to any statements or positions taken by the four Plaintiffs.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  This threadbare allegation does not meet the "plausibility standard" required to survive a

motion to dismiss.  *Id.*

Plaintiffs' claim is also internally illogical.  The zero-based review resulted in a suspension of proceedings for the *entire* Board, including Board members who may have had different opinions than the four Plaintiffs bringing the claim.  Not only have Plaintiffs failed to identify a specific incidence of protected speech that prompted the Board suspension, but they have also failed to show how the Board suspensions specifically "chilled" *their* speech, *see* Fourth Am. Compl. ¶ 143.  Plaintiffs have failed to allege any facts giving rise to a plausible inference that the Board suspension constituted "viewpoint discrimination," and accordingly, Count Three should be dismissed as to the Board suspension claims.

## III. Plaintiffs' Claims Challenging the Secretary's Decision to Approve Subcommittees Should Be Dismissed

### A. This Court has no jurisdiction over Plaintiffs' challenges to the Secretary's decision allowing the Boards to form subcommittees.

Plaintiffs have no standing to challenge the Secretary's decision to authorize the Boards to create subcommittees because they have failed to show how the existence of a subcommittee constitutes an injury-in-fact.  Moreover, any decision by the Secretary on whether to authorize subcommittees is a matter committed to his discretion and is not reviewable by courts.

> 1. *Plaintiffs have no standing to challenge the Secretary's authorization of subcommittees because they have not established a concrete injury-in-fact.*

Plaintiffs do not have standing to bring claims challenging the Secretary's authorization of the creation of subcommittees because they have not demonstrated that it caused them a concrete injury.  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  But "[o]nly those plaintiffs who have been *concretely harmed*" by a defendant's actions "may sue that private defendant over that violation in federal court."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021).  Plaintiffs who

have not "suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts" cannot establish an injury in fact. *Id.* at 2206.

Plaintiffs have not alleged that they have suffered any injury from the Secretary's decision to permit the Boards to create subcommittees. First, Plaintiffs do not assert that any Board has actually created a subcommittee—just that Secretary Austin has authorized them to do so "if [they] determine such action is essential to [Board] operations." Fourth Am. Compl., Ex. 1. To the extent that Plaintiffs rest their standing theory on the risk of future harm from the subcommittees (and again, it is hard to imagine that a subcommittee would cause actual harm to Plaintiffs), any future creation of a subcommittee is purely speculative. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Second, any hypothetical creation of a subcommittee on a Board is plainly not harmful—it is a means by which the Boards may internally organize themselves. Plaintiffs Stirrup, Lengenfelder, Gleason, Spicer and Norman do not even currently serve on any Board. And the Complaint contains no allegations that Green, the only Plaintiff who does serve on a Board, is being improperly excluded from any subcommittee. Indeed, the closest Plaintiffs come to articulating any potential harm deriving from the subcommittees is calling them the "functional equivalent of 'court-packing,'" Fourth Am. Compl. ¶ 23—but this analogy defies reason, because Board membership is fixed by statute at sixteen members each. Because Plaintiffs have not demonstrated that the subcommittee decision has imposed any concrete or imminent harm upon them, they have no standing to challenge this action.

### 2. *The Secretary's authorization of subcommittees is committed to agency discretion by law and not reviewable.*

Courts do not have jurisdiction to hear APA claims when the challenged action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception to APA review applies when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). A party can demonstrate the unavailability of judicial review by showing there is "no law to apply." *Citizens to Preserve Overton*

*Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). "In such circumstances, the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). In determining whether courts can engage in judicial review of an agency action, courts consider "both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006) (citation omitted).

As explained in further detail below, *see infra* Part III.B, Secretary Austin acted pursuant to FACA when he authorized the Boards to form subcommittees. That provision has no concrete standard that a court can apply in reviewing this action. Under FACA, the Secretary "shall establish uniform administrative guidelines and management controls for advisory committees established by that agency." 5 U.S.C. App. 2 § 8(a). Beyond that, the statute does not specify what types of administrative guidelines the Secretary may establish, or how he should formulate these administrative guidelines. The statute therefore contains no standard against which a court can review the choice to permit the Boards to establish subcommittees. *See Diebold v. United States*, 947 F.2d 787, 789 (6th Cir. 1991) (noting action is committed to agency discretion when no "standards, definitions, or other grants of power [that] deny or require action . . . or confine an agency within limits as required by the Constitution" (quoting S. Doc. No. 79-248, at 212, 275 (1946)). Accordingly, Secretary Austin's decision on subcommittees falls within his sole discretion and is not reviewable by a court, so Plaintiffs' APA challenges should be dismissed.

### B.  Plaintiffs have failed to allege sufficient facts to show that the Secretary unlawfully decided to establish subcommittees.

Even if this Court does find that it has jurisdiction to hear Plaintiffs' claims challenging the Secretary's decision to establish subcommittees, those claims would fail nonetheless. Secretary Austin was acting well within his authority when he pronounced that the Boards could create subcommittees. The Boards' originating statutes are silent on the issue of subcommittees. But as noted, *see supra* at 42, the Boards are also subject to the provisions of FACA. *See* 41 C.F.R. § 102-3.50(a); *see also* Air Force

Academy Board Charter § 2; USMA Board Charter § 2; Naval Academy Board Charter § 2.  FACA dictates that agency heads "shall establish uniform administrative guidelines and management controls for advisory committees established by that agency."  5 U.S.C. App. 2 § 8(a).  The ability of the Secretary to authorize subcommittees falls within his authority to establish "administrative guidelines" and manage the committees.  The regulations implementing FACA expressly permit this, stating that "[t]he creation and operation of subcommittees must be approved by the agency establishing the parent advisory committee." 41 C.F.R. § 102-3.35.  In this case, the "agency establishing" the Boards is the Department of Defense.  As the head of that agency, Secretary Austin is empowered to "approve[]" the "creation and operation" of the subcommittees—and he has done just that here.  *See id.*  Because Secretary Austin exercised authority that Congress lawfully delegated to him under FACA, the creation of subcommittees also did not unconstitutionally usurp any purported "Congressional oversight function," Fourth Am. Compl. ¶ 146, or violate Article I, § 8, cl. 14 of the Constitution.

Other parts of FACA expressly refer to subcommittees, suggesting the statute permits advisory committees to utilize subcommittees.  *See* 5 U.S.C. App. 2 § 3(2) (defining "advisory committee" as "any subcommittee" that meets certain standards).  And this Circuit has favorably recognized the existence of subcommittees within FACA advisory committees.  *See Elec. Priv. Info. Ctr. v. Drone Advisory Comm.*, 995 F.3d 993, 999-01 (D.C. Cir. 2021) (holding that an FAA advisory committee's subcommittee is not subject to FACA requirements); *see also* id. at 997 (noting the various regulations promulgated by the General Services Administration on FACA's application to subcommittees).  Because Secretary Austin acted pursuant to his lawful statutory authority, Plaintiffs have failed to state a claim under either the APA or the Constitution.

### C. Plaintiffs have failed to allege that decision to permit subcommittees constituted impermissible viewpoint discrimination.

Plaintiffs allege that the decision to create subcommittees amounts to a "packing" of personnel by the Secretary that would "ensure uniformity of viewpoint to the exclusion of any other viewpoint," in violation of the First Amendment.  Fourth Am. Compl. ¶ 142.  As with their removal and board-suspension claims, Plaintiffs have failed to identify any non-speculative basis for this allegation.  *See*

*supra* Sections I.D., II.C.  Plaintiffs do not allege a single fact suggesting that the Secretary of Defense would "hand-pick[]" subcommittees to exclude certain views.  Further, the Secretary's decision only allowed the Boards to establish subcommittees—he did not actually create any.  His announcement was not mandatory, as he explained that subcommittees would only be created if it was determined that "such action is essential to [Board] operations."  Fourth Am. Compl., Ex. 1.  Because Plaintiffs again have not pled *any* "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, the Court should dismiss Count Three with respect to the subcommittee claims.

## **CONCLUSION**

For the reasons above, the Court should grant Defendants' Motion to Dismiss.


Dated May 9, 2022                                    Respectfully submitted,

                                                     BRIAN M. BOYNTON
                                                     *Principal Deputy Assistant Attorney General*

                                                     CHRISTOPHER R. HALL
                                                     *Assistant Branch Director*

                                                     */s/ Madeline M. McMahon*
                                                     MADELINE M. MCMAHON
                                                     (DC Bar No. 1720813)
                                                     *Trial Attorney*
                                                     U.S. Department of Justice
                                                     Civil Division, Federal Programs Branch
                                                     1100 L Street, NW
                                                     Washington, DC 20530
                                                     Telephone: (202) 451-7722
                                                     Email: madeline.m.mcmahon@usdoj.gov

                                                     *Counsel for Defendants*